John W. **BARNHART** et al.,
Plaintiffs,

v.

Claude **BRINEGAR**, Secretary, Department of Transportation, et al.,
Defendants.

No. 73CV57-W-2.

United States District Court,
W. D. Missouri, W. D.

Aug. 6, 1973.

Howard E. Bodney, of Gage, Tucker, Hodges, Kreamer, Kelly & Varner, Kansas City, Mo., Byron Constance, of Reese, Constance, Slayton, Stewart & Stewart, Independence, Mo., Tom J. Helms, Kansas City, Mo., for plaintiffs.

Earl H. Schrader, Jr., Missouri State Highway Commission, Vernon A. Poschel, Asst. U. S. Atty., Kansas City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER DISMISSING COMPLAINT

COLLINSON, District Judge.

This is an action by four real property owners in Jackson County, Missouri, seeking various forms of relief, including declaratory judgment, specific performance, and injunction, against the Secretary of Transportation (Secretary) and the Missouri State Highway Commission (Commission.) [1] The Commission is attempting to acquire five tracts of plaintiffs' real property in Jackson County by condemnation for a federally assisted state highway improvement project. Plaintiffs' complaint was filed January 31, 1973. We issued an order on February 2, 1973, temporarily restraining the Commission from prosecuting its condemnation action against plaintiffs' property in the Jackson County Circuit Court. The Commission consented to continuing the temporary restraining order until the hearing on plaintiffs' application for a preliminary injunction. That hearing and the trial on the merits were consolidated under Rule 65(a)(2), Fed.R.Civ.P. The consolidated hearing and trial were held April 13, 1973. The Commission again consented to continuing the temporary restraining order pending the Courts' final judgment.

Plaintiffs' complaint is in two counts. We will consider each count separately.

I.

The facts necessary for disposition of Count I have been stipulated. Plaintiffs are residents of Jackson County, Missouri, and are co-owners of the five tracts of land in Jackson County that are the subject of this action. These tracts abut and are approximate to U. S. Highway 24, a Federal Aid Primary System Highway, at its intersection with U. S. Highway 71 Bypass. For several years the Commission has pursued a project to improve U. S. Highway 24 by widening it from the eastern city limits of Kansas City, Missouri, to Missouri State Route 7. The federal government has been involved in this project since September 17, 1965.

In connection with the highway improvement project, the Commission has attempted to acquire plaintiffs' five tracts of land. In December, 1970, the Commission engaged two appraisers to appraise plaintiffs' property. The appraisals were submitted to the Commission between July and December, 1971. On January 10, 1972, the Commission made a written offer to plaintiffs in the amount of $232,510 for the purchase of their property. The Commission also provided plaintiffs with a booklet entitled "When a highway comes your way." Plaintiffs rejected the Commission's offer.

On March 14, 1972, the State Director of Highways gave the Federal Highway Administration written assurances pursuant to section 305 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (the Act) [2] that the Commission would comply with the real property acquisition practices delineated in section 301 of the Act [3] as a condition to receiving any federal financial assistance in the highway improvement project. [4] These assurances

---

1. There are two additional named defendants: the Federal Regional Highway Administrator and the Division Engineer of the Federal Highway Administration.

2. Pub.L.No.91-646, § 305, 42 U.S.C. § 4655 (1970).

3. *Id.* § 301, 42 U.S.C. § 4651 (1970).

4. The written assurances from the State Director of Highways were in the form

were approved by the Federal Highway Administration.[5]

Updated appraisals of plaintiffs' property were submitted to the Commission between June and August, 1972. On September 26, 1972, the Commission made a second written offer to plaintiffs in the increased amount of $246,050 for the purchase of their property. Plaintiffs again were provided a booklet entitled "When a highway comes your way." Plaintiffs rejected the Commission's offer on September 26, 1972.

On October 24, 1972, the Commission initiated an action in the Jackson County Circuit Court seeking condemnation of plaintiffs' property. This action was authorized by a Commission resolution of January 31, 1972.

■ Count I alleges federal question jurisdiction under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970.[6] Specifically, plaintiffs allege that several of the land acquisition practices delineated in section 301 of the Act have not been observed by the Commission to the greatest extent practicable under Missouri law. Section 301 establishes nine mandatory practices for *federal* agencies in the acquisition of real property for *federal* programs. The following are the two practices delineated in section 301 relevant to this action:

(3) Before the initiation of negotiations for real property, the head of the Federal agency concerned shall establish an amount which he believes to be just compensation therefor and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the agency's approved appraisal of the fair market value of such property. Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner, will be disregarded in determining the compensation for the property. The head of the Federal agency concerned shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount he established as just compensation. Where appropriate the just compensation for the real property acquired and for damages to remaining real property shall be separately stated.

of a letter to defendant Hickman, Division Engineer of the Federal Highway Administration. The following is the relevant portion of that letter:

Reference is made to my letters of February 4, 1971, and January 14, 1972, both relating to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970. Reference is also made to Mr. O'Connor's memorandum to Mr. Kemp bearing date of March 7, 1972.

The first above-mentioned letter assured you that in the acquisition of real property, the State Highway Commission will be guided to the greatest extent practicable under state law by the land acquisition policies in Sections 301 and 302 of Public Law 91–646. There is no inability to comply with these sections and none has been suggested.

You are further assured, as we believe to be fully stated in the letter of January 14, 1972, that as of July 1, 1972, the State Highway Commission will comply with Section 305 of the said Public Law 91–646.

5. Defendant Kemp, Regional Federal Highway Administrator, approved the Commission's assurances in a memorandum dated May 17, 1972:

This office and the Office of Chief Counsel have reviewed the Section 305 assurances contained in a letter dated March 14, 1972, from Mr. T. A. David, Director of Highways, Missouri State Highway Commission.

The assurances are approved.

6. Pub.L.No.91–646, §§ 101–305, 42 U.S.C. §§ 4601–4655 (1970).

.    .    .    .    .    .

(7) In no event shall the head of a Federal agency either advance the time of condemnation, or defer negotiations or condemnation and the deposit of funds in court for the use of the owner, or take any other action coercive in nature, in order to compel an agreement on the price to be paid for the property.[7]

Plaintiffs allege that these provisions are applicable to the Commission by virtue of the Commission's March 14, 1972, written assurances to the Federal Highway Administration under section 305 of the Act that it would comply with the acquisition practices of section 301. Section 305 of the Act provides the following:

Notwithstanding any other law, the head of a Federal agency shall not approve any program or project or any grant to, or contract or agreement with, a State agency under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the acquisition of real property on and after [January 2, 1971,] unless he receives satisfactory assurances from such State agency that—

(1) in acquiring real property it will be guided, to the greatest extent practicable under State law, by the land acquisition policies in section 301 and the provisions of section 302, and

(2) property owners will be paid or reimbursed for necessary expenses as specified in sections 303 and 304.[8]

Defendants have challenged plaintiffs' jurisdictional allegation, asserting that section 102(a) of the Act effectively precludes judicial review of a state agency's action under the acquisition practices of section 301. Section 102(a) provides the following:

(a) The provisions of section 301 of title III of this Act create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation.[9]

Defendants direct the Court's attention to four cases construing section 102(a) to preclude judicial review of a state agency's acquisition practices. Nall Motors, Inc. v. City of Iowa City, Civil No. 72–47–D (S.D.Iowa, Jan. 2, 1973) (not reported); Martinez v. Department of Housing and Urban Development, 347 F.Supp. 903 (E.D.Pa.1972); Rubin v. Department of Housing and Urban Development, 347 F.Supp. 555 (E.D.Pa. 1972); Will-Tex Plastics Mfg., Inc. v. Department of Housing and Urban Development, 346 F.Supp. 654 (E.D.Pa. 1972). In each of these cases the district courts found that section 301 of the Act does not create rights in favor of property owners. The decisions rested on the "no rights or liabilities" language of section 102(a) of the Act and upon the congressional intent behind section 102(a) as expressed in H.R.Rep.No.91– 1656, 91st Cong., 2d Sess. ——, 1970 U. S.Code Cong. & Ad.News, pp. 5850, 5854–55.[10] Plaintiffs suggest, however, that the district courts in the cited cases erred in relying on the House Report. Because of this contention, we have examined the history of the Act at great length. Although we do not agree completely with plaintiffs' suggestion, we find that subsequent Senate action on section 102 of the bill detracts significantly from the House Report as a reliable reflection of congressional intent. For this reason we will review the entire legislative history of the Act with a view toward discerning the intent behind section 102(a) of the Act.

Before doing so, however, the need for clarity dictates that we offer a brief ex-

---

7. *Id.* § 301, 42 U.S.C. § 4651 (1970).

8. *Id.* § 305, 42 U.S.C. § 4655 (1970).

9. *Id.* § 102(a), 42 U.S.C. § 4602(a) (1970).

10. The exact language of the House Report upon which the courts in the cited cases relied is contained in the text at note 32, *infra.*

planation of the Act's provisions. Title I of the Act contains two sections.[11] Section 101 provides definitions. Section 102 delimits the effects of the Act on property acquisitions. Specifically, section 102(a) contains the "no rights and liabilities" language which we must interpret. Title II of the Act is concerned principally with aid to persons displaced by federal or federally assisted state projects.[12] Section 201 declares the purpose of the title:

> The purpose of this title is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole.[13]

Section 202 provides for payment of moving and related expenses;[14] section 203, for replacement housing;[15] section 204, for replacement housing for tenants;[16] section 205, for relocation assistance advisory services;[17] section 210, for applicability of sections 202–205 to federally assisted state projects by written assurances of state agencies.[18] Title III of the Act is concerned primarily with the acquisition of real property for federal and federally assisted state projects.[19] Section 301 delineates nine real property acquisition practices "[i]n order to encourage and expedite the acquisition of real property by agreements with owners, *to avoid litigation and relieve congestion in the courts*, to assure consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices. . . ."[20] Section 302 establishes policies for the acquisition of buildings, structures and improvements;[21] section 303, for payment of title transfer expenses to property owners;[22] section 304, for payment of litigation expenses to property owners in condemnation actions;[23] and section 305, for the applicability of sections 301–304 to federally assisted state projects by written assurances of state agencies.[24] The instant action involves only section 102(a) of title I and sections 301 and 305 of title III.

With this in mind, we can begin our review of the Act's history. One caveat—the evolution of section 102(a), which is our principal concern, is exceedingly complex.

On January 15, 1969, Senator Edmund Muskie introduced a bill (S.1) "to provide for uniform and equitable treatment of persons displaced from their homes, businesses, or farms by Federal or federally assisted programs and to establish uniform and equitable land acquisition policies for Federal and federally assisted programs." The bill was referred to the Senate Committee on Government Operations where it was assigned to the Subcommittee on Intergovernmental Relations. After extensive hearings, the bill was approved by the Subcommittee and returned to the Committee on April 16, 1969. The Government Operations Committee reported favorably on the bill with amendments and recommended passage.[25] The bill as introduced by Senator Muskie contained only three titles and no provisions re-

---

11. Pub.L.No.91–646, §§ 101, 102, 42 U.S.C. §§ 4601, 4602 (1970).

12. *Id.* §§ 201–221, 42 U.S.C. §§ 4621–4638 (1970).

13. *Id.* § 201, 42 U.S.C. § 4621 (1970).

14. *Id.* § 202, 42 U.S.C. § 4622 (1970).

15. *Id.* § 203, 42 U.S.C. § 4623 (1970).

16. *Id.* § 204, 42 U.S.C. § 4624 (1970).

17. *Id.* § 205, 42 U.S.C. § 4625 (1970).

18. *Id.* § 210, 42 U.S.C. § 4630 (1970).

19. *Id.* §§ 301–305, 42 U.S.C. §§ 4651–4655 (1970).

20. *Id.* § 301, 42 U.S.C. § 4651 (1970) (emphasis added).

21. *Id.* § 302, 42 U.S.C. § 4652 (1970).

22. *Id.* § 303, 42 U.S.C. § 4653 (1970).

23. *Id.* § 304, 42 U.S.C. § 4654 (1970).

24. *Id.* § 305, 42 U.S.C. § 4655 (1970).

25. S.Rep.No.91–488, 91st Cong., 1st Sess. 1 (1969).

garding judicial review. When reported by the Committee, however, an important amendment providing judicial review of agency action had been added: "Title IV—Judicial Review." The Report of the Government Operations Committee discussed the nature of the new title IV:

> The committee added title IV, which states, in section 401, that provisions of sections 551–553, and 701–706 of title V, United States Code [Administrative Procedure Act], shall apply to any action of a Federal agency undertaken through titles II and III. For purposes of this title, the definition of "person" contained in section 551(2) of title V, United States Code, is deemed to include a State·as defined in section 102 of this act.

> Section 402 provides that any person or State adversely affected or aggrieved by a final action of a Federal agency under title II or III of this act may seek judicial review of such final agency action and demand appropriate relief in a judicial district of the United States. . . .[26]

The Committee's Report offered the following "analysis" of the judicial review provisions of the new title IV:

> Section 401 makes appropriate provisions of the Administrative Procedure Act applicable to all actions of a Federal agency under titles II and III. For clarification, the term "person" contained in such provisions shall be deemed to include a State as defined in the proposed act, section 102.

> Section 402 states that any person or State adversely affected or aggrieved by a final action of a Federal agency under title II or title III of this act may seek judicial review of such final agency action and demand appropriate relief in a judicial district of the United States. . . .[27]

The bill as reported from the Committee was considered by the Senate on October 27, 1969.[28] The Committee's amendments, including the new judicial review provisions, were allowed,[29] and the bill was passed.[30]

In the House of Representatives, the bill was referred to the Public Works Committee. Only the enacting clause of the Senate bill was preserved by that Committee; the remainder of the bill was completely revised and the revision was reported to the floor of the House as a single amendment. Title IV of the Senate version was supplanted by a new section 102 of title I in the revised House version. Section 102 precluded judicial review of agency decisions in all instances:

> Sec. 102. (a) Any determination by the head of a Federal agency administering a program or project as to payments under titles II and III of this Act shall be final and no provision of such titles shall be constructed to give any person a cause of action in any court, nor may any violation of either of such titles be raised as a defense by such person in any action.

> (b) The provisions of section 301 [which is now 42 U.S.C. § 4651 providing the nine mandatory real property acquisition practices] of title III of this Act create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation.

> (c) Nothing in this Act shall be construed as creating in any condemnation proceedings brought under the power of eminent domain, any element of value or of damage not in existence on the date of enactment of this Act.[31]

The foregoing subsection 102(a) of the bill is a broad denial of judicial review of any agency decision under titles II and III of the bill which correspond exactly with titles II and III of the Act.

---

26. *Id.* at 4.

27. *Id.* at 22.

28. 115 Cong.Rec. 31533–31535 (1969).

29. *Id.* at 31534.

30. *Id.* at 31535.

31. 116 Cong.Rec. 40164 (1970).

The foregoing section 102(b) of the bill is the exact language of section 102(a) of the Act which we must interpret. Section 102(b) complements section 102(a) but is much narrower in scope. It has one purpose: the disallowance of rights or liabilities arising under section 301 of the bill which established the nine mandatory real property acquisition practices. We will arrive at the congressional intent behind subsection 102(a) *of the Act* by tracing the legislative development of section 102 *of the bill.*

The House Committee's Report explained the reason for section 102:

> This action [*sic*] provides that any determination by the head of the Federal agency administering a program or project, as to payments under the act, shall be final, and that this act does not give any person a cause of action or a defense to an action in any court, or create any new elements of value or damage in any eminent domain proceedings. It states also that the provisions of the uniform policy on land acquisition practices, in section 301 [now 42 U.S.C. § 4651], do not create any rights or liabilities in any person and do not affect the validity of any acquisition by purchase or condemnation.
>
> The committee has considered, but does not agree with, proposals which would make the benefits provided by the bill subject to judicial review. The committee agrees with the judgment of the Department of Justice, and others, who believe that this would add an unnecessary burden to the over-crowded courts. The primary purpose of the judicial review proposals is to give recognition to the principle that such benefits should be viewed as administrative payments to displaced persons. The committee believes that this objective can be

achieved by the clear language of the bill which makes relocation payments and assistance, and the availability of suitable replacement housing for displaced persons, matters of congressional policy and makes agency heads responsible for faithful execution. . . .[32]

The bulk of the Committee's explanation of section 102 concerns judicial review of agency decisions on relocation payments and assistance rather than judicial review of agency conformance to the real property acquisition practices of section 301. Nevertheless, section 102 did affect judicial review of agency acquisition practices in two respects. First, section 102(a) barred causes of action on any provision in title III of the bill which included the real property acquisition practices in section 301. Secondly, section 102(b) specifically disallowed any rights or liabilities under section 301.

The bill was considered by the House on December 7, 1970.[33] The House passed the bill as amended by the Public Works Committee.[34]

The House amended version of the bill was considered by the Senate on December 7, 1970.[35] On the floor, Senator Muskie moved to accept the House amendment to the bill. The Senator also proposed an additional amendment calling for the deletion of section 102(a) of the bill, and the renumbering of sections 102(b) and (c) as 102(a) and (b).[36] Senator Muskie explained the reasons for his proposed amendment and its intended effect:

> The Senate has enacted this legislation twice, once last Congress and once early in this Congress [S.1]. The House has now acted on it with some amendments in disagreement which we have discussed with the House. The House is unwilling to go to conference. *So we have undertaken*

32. H.R.Rep.No.91–1656, 91st Cong., 2d Sess. ——, 1970 U.S.Code Cong. & Ad. News, pp. 5850, 5854–5855.

33. 116 Cong.Rec. 40163–40172 (1970).

34. *Id.* at 40172.

35. *Id.* at 42132–42140.

36. *Id.* at 42137.

*to work out amendments to which the House will agree so that we can avoid the conference.*

That is the substance of the amendment which I have offered on the floor this afternoon.

The principal amendment has to do with the question of judicial review. The Senate bill, as enacted, provided for judicial review. The House struck out that provision.

*We are now offering an amendment that will leave the question of review in the existing law.*[37]

Senator Muskie's comment may be misleading if viewed out of context. The main thrust of the proposed amendment was to effect a compromise between the House and Senate on the question of judicial review of agency action. The need for compromise is strongly evidenced not only by the actions of the two bodies but also by a memorandum analyzing the differences between the House and Senate versions of the bill which Senator Charles Percy was allowed to place in the record. A portion of the Percy memorandum is revealing:

The essential differences between House-Senate versions of the bill are:

### MAJOR CHANGES

1. *Judicial Review*—House version strikes Title IV provisions of S.1. All determinations made by heads of federal agencies regarding relocation/acquisition, are final. Nothing in the bill is to be construed as creating any element of value or damages under condemnation proceedings.

. . . . .

*Comment*: (i) *The judicial review* feature included in the Senate version was knocked out because neither Justice nor BOB [Bureau of the Budget] felt it served any immediately useful purpose. (Excessive litigation and crowded dockets being the reasons.)

The House provisions require considerable discretion on the part of the administrator, inasmuch as judicial review could effectively hamstring implementation of any project while the parties sought resolution through the courts, its omission undoubtedly will free the hand of the administrator in his approach to individual cases. (House staff have indicated that if the Senate insists on it being included, the bill will be lost.)[38]

The Percy memorandum leaves no doubt concerning the House's and the Senate's conflicting positions on the question of judicial review of agency action.

What then was the compromise that Senator Muskie intended to effect by his proposed amendment deleting section 102(a) of the bill? This compromise, as all compromises, satisfied *in part* the desires of both parties. First, the deletion of section 102(a) effectively opened the door to judicial review of agency action under title II and sections 302–304 of title III through the Administrative Procedure Act, 5 U.S.C. § 702 (1970):

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

and 5 U.S.C. § 704 (1970):

Agency action made reviewable by statute and final agency action for which there is no other remedy in a court are subject to judicial review.

. . . . . .

Secondly, the retention of section 102(b) as 102(a) effectively closed the door to judicial review of agency action under the nine mandatory real property acquisition practices in section 301 of the bill.[39] Simply put, if one has "no rights or liabilities" under the provisions of section 301 of the bill, then one cannot be adversely affected or aggrieved by agency action under that section. Sena-

---

37. *Id.* (emphasis added).

38. *Id.* at 42138.

39. 42 U.S.C. § 4651 (1970).

tor Muskie's motion to accept the House version of the bill with his amendment was passed.[40]

The bill as amended in the Senate was considered by the House on the following day, December 18, 1970.[41] Representative Ed Edmondson was asked to explain to the house the effect of Senator Muskie's amendment:

> MR. EDMONDSON. The substance of the amendments added to the House bill by the Senate can be stated in about 1 minute.
>
> In the first place, the Senate strikes out language which they thought operated to limit judicial review. *They make it quite clear as to any eminent domain or condemnation case that there would be full judicial review afforded.* I believe it is agreeable to both sides, insofar as the committee is concerned, to accept this amendment.[42]

Though Representative Edmondson merits credit for his brevity, he merits none for clarity and precision. Nevertheless, if Representative Edmondson's statement is viewed in light of the House Public Works Committee Report which expressly rejected proposals for judicial review, of the Percy memorandum which reflected the House's strong opposition to judicial review, and of Senator Muskie's comments regarding the workable compromise arranged out of conference, then Representative Edmondson's statement is meaningful. The Representa-

tive from Oklahoma was merely expressing the Senate end of the House-Senate compromise, *viz.*, judicial review of agency decisions regarding relocation payments and assistance, replacement housing, and title transfer and litigation expenses [43] was to be governed by the existing law, the Administrative Procedure Act.[44]

The House version of the bill with Senator Muskie's compromise amendment passed the House.[45] The bill became law with the President's signature on January 2, 1971.

█ This completes our review of the history of the "no rights or liabilities" language of section 102(a) of the Act.[46] From this history, we believe one conclusion is irresistable—Congress intended section 102(a) to preclude judicial review of federal and state agency actions under the real property acquisition practices of section 301 of the Act.[47] The intended result is accomplished in two ways. First, if one has no rights under section 301, then one cannot be adversely affected or aggrieved by agency action. This bars review of federal agency decisions under the Administrative Procedure Act. Secondly, if one has no rights under section 301, we conclude that an action against a state agency under section 301 does not "arise under" the Constitution or laws of the United States within the meaning of 28 U.S.C. § 1331(a) (1970).[48] Federal

---

40. 116 Cong.Rec. at 42140.

41. *Id.* at 42506–42507.

42. *Id.* at 42506 (emphasis added).

43. Pub.L.No.91–464, §§ 201–221, 302–304, 42 U.S.C. §§ 4621–4638, 4652–4654 (1970).

44. 5 U.S.C. §§ 701–706 (1970).

45. 116 Cong.Rec. at 42507.

46. Pub.L.No.91–646, § 102(a), 42 U.S.C. § 4602(a) (1970).

47. *Id.* § 301, 42 U.S.C. § 4651 (1970).

48. Plaintiffs' allegation that their Fifth and Fourteenth Amendment rights have been violated is frivolous. Due process in a condemnation proceeding requires

only that one have reasonable notice and reasonable opportunity to be heard and to present one's claim or defense. Dohany v. Rogers, 281 U.S. 362, 369, 50 S.Ct. 299, 74 L.Ed. 904 (1930). Plaintiffs do not allege that they were denied the required notice or opportunity. Furthermore, due process does not extend to the negotiation procedures delineated in section 301 of the Act for no deprivation of property occurs at that stage of an acquisition effort. Where an alleged claim under the Constitution clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous, the action may be dismissed for lack of federal question jurisdiction. Bell v. Hood, 327 U.S. 678, 682–

question jurisdiction is thus effectively barred. As a matter of compromise, Congress passed section 301 as an expression of congressional policy and entrusted the faithful execution of its stated policy solely to the administrators of the Act. This action plainly demonstrates the validity of the House's concern with providing judicial review of agency decisions under the Act: a substantial portion of a federally assisted state highway improvement project has been halted for several months pending litigation before this Court.

Count I of the complaint will be dismissed for lack of jurisdiction.

## II.

Count II of the complaint seeks relief on a contract theory. Plaintiffs allege that the Secretary and the Commission entered into an agreement on December 28, 1970; that the agreement was modified on August 24, 1971, November 4, 1971, February 22, 1972, and November 7, 1972; and that the Commission's March 14, 1972, written assurances under section 305 of the Act that it would comply with the real property acquisition practices of section 301 of the Act are incorporated by reference into the December 28 agreement. Plaintiffs further allege that the Commission has not complied with the real property acquisition practices incorporated in the agreement; that the Secretary has not enforced compliance with those practices; and that plaintiffs are third party beneficiaries of the agreement entitled to enforce its terms.

The facts necessary for disposition of Count II are readily summarized. On September 17, 1965, the federal government became involved in the Commission's highway improvement project when the Bureau of Public Roads grant-

ed program approval to the Commission.[49] Over the course of the next five years the Commission conducted various stages in planning and preparation, including the preparation of detail maps, the placing of public advertisements, and the holding of public hearings. In 1970, the project involving plaintiffs' property was approved.[50] On December 28, 1970, the Commission and the Federal Highway Administration executed a "FEDERAL–AID PROJECT AGREEMENT."[51] The following are the general terms of the Project Agreement:

The State, through its Highway Department, having complied, or hereby agreeing to comply, with the terms and conditions set forth in (1) Title 23, U.S.Code, Highways, (2) the Regulations issued pursuant thereto and, (3) the policies and procedures promulgated by the Federal Highway Administrator and the Director of Public Roads relative to the above designated project, and the Bureau of Public Roads having authorized certain work to proceed as evidenced by the date entered opposite the specific item of work, Federal funds are obligated for the project not to exceed the amount shown herein, the balance of the estimated total cost being an obligation of the State. Such obligation of Federal funds extends only to project costs incurred by the State after the Bureau of Public Roads authorization to proceed with the project involving such costs.

. . . . . .

The State further stipulates that pursuant to Title 23, Regulations, and policies and procedures, and as a condition to payment of the Federal funds obligated, it accepts and will

683, 66 S.Ct. 773, 90 L.Ed. 939 (1946). "The accuracy of calling these dismissals jurisdictional has been questioned." Bell v. Hood, *supra* at 683, 66 S.Ct. at 776. Whether the dismissal is for failure to state a claim or for lack of jurisdiction, the result here is the same. T. B. Harms

Co. v. Eliscu, 339 F.2d 823, 827–828 (2d Cir. 1964).

49. 23 U.S.C. § 105 (1970).

50. 23 U.S.C. § 106 (1970).

51. 23 U.S.C. § 110 (1970).

comply with the applicable provisions set forth on the reverse hereof.

The reverse of the agreement form contains 14 additional provisions, none of which incorporate directly or indirectly the real property acquisition practices of section 301 of the Act. The Project Agreement obligated $55,000 in federal funds.

The Project Agreement was modified August 24, 1971, by increasing the amount of obligated federal funds to $267,400; November 4, 1971, by increasing the amount of obligated federal funds to $552,200; and February 22, 1972, by increasing the amount of obligated federal funds to $847,200.

On March 14, 1972, the Commission gave written assurances to the Federal Highway Administration [52] pursuant to section 305 of the Act [53] that it would comply with the real property acquisition practices of section 301 of the Act [54] as a condition for receiving any federal funds. These assurances were approved.[55]

On November 7, 1972, the Project Agreement was again modified by increasing the amount of obligated federal funds to $898,084. This modification, as all the modifications, provided: "All other terms and conditions of the Project Agreement will remain in full force and effect." None of the modifications mentioned or incorporated directly or indirectly the real property acquisition practices of section 301 of the Act.

As of March 6, 1973, $402,530.52 in federal funds had been paid the Commission under the Project Agreement. Although the Commission has not applied for federal funds for the acquisition of plaintiffs' property, the Commission intends to apply for and expects to receive federal funds, if available, for that acquisition.

The Commission submits claims for federal funds under the Project Agreement periodically.[56] The claims are paid upon submission. At a later date, the Federal Highway Administration audits or monitors the Commission's acquisition practices to determine whether the section 301 acquisition practices have been complied with. The audit is only of selective samples. Approximately 10 to 25 per cent of the acquisitions in any single project are examined for compliance. If irregularities are discovered, an in-depth audit is conducted. When noncompliance is discovered, the auditor reports to the Division Engineer. The Division Engineer advises the Commission of the noncompliance and the Commission is given an opportunity to justify its procedure or bring that procedure into compliance with the section 301 practices. Failure to justify or cure noncompliance will result in a denial of federal funds for the particular acquisition in question.

Count II does not contain a separate jurisdictional allegation. Paragraph 1 of Count II does reallege all the allegations of Count I. In Count I, plaintiffs alleged federal question jurisdiction, 28 U.S.C. § 1331(a) (1970), under sections 301 and 305 of the Act. Part II of Standard Pretrial Order No. 2 contains the following statement of jurisdiction:

*Federal jurisdiction is invoked upon the ground:* [Title 28, U.S.C.A., Sec. 1331(a)] Plaintiffs contend that each tract of land involved in the instant controversy has a value in excess of the sum of Ten Thousand and 00/100 ($10,000.00) Dollars, exclusive of interests and costs, that the declaratory relief and the specific perform-

---

52. For the text of those assurances see note 4, *supra.*

53. Pub.L.No.91–646, § 305, 42 U.S.C. § 4655 (1970).

54. *Id.* § 301, 42 U.S.C. § 4651 (1970).

55. For the text of the approval see note 5, *supra.*

56. "The Secretary may, in his discretion, from time to time as the work progresses, make payments to a State for costs of construction incurred by it on a project." 23 U.S.C. § 121(a) (1970).

ance sought by plaintiffs requires a determination as to whether or not the provisions, or any part thereof, of Title 42, U.S.C.A., Secs. 4601 et seq. and particularly Title 42, U.S.C.A., Sec. 4651 have been violated and whether said violations constitute a denial of due process and equal protection of the laws as prescribed by the Fifth and Fourteenth Amendments of the Constitution of the United States of America.

■ Plaintiff's allegation of federal question jurisdiction will not support the contract theory advanced in Count II. In discussing and disposing of Count I, we conclude that the "no rights or liabilities" language of section 102(a) of the Act [57] effectively precludes judicial review of the Commission's conformance to the acquisition practices of section 301 of the Act. Simply put, if a plaintiff has no rights under section 301, an action will not "arise under" that statute within the meaning of 28 U.S.C. § 1331(a) (1970). Count II is an artful attempt to side step this conclusion. By couching the allegations of Count II in contract, plaintiffs are able to allege a contract right to the section 301 practices as opposed to a statutory right. Plaintiffs suggest as long as there is a right to the section 301 practices, the action "arises under" a law of the United States and the source of the right is unimportant. We do not agree.

Assuming *arguendo* that the section 301 practices were incorporated in the Project Agreement and that the Project Agreement is a contract enforceable by plaintiffs as third party beneficiaries, any right they may have is a contract right not "arising under" the Constitution or laws of the United States. We do not mean to suggest that a contract right can never "arise under" the Constitution or laws of the United States, only that it does not in this instance.

Frankly, it is more than a little difficult to determine what does "arise under" as that phrase is used in 28 U.S.C. § 1331(a) (1970). "Though the meaning of this phrase has attracted the interest of such giants of the bench as Marshall, Waite, Bradley, the first Harlan, Holmes, Cardozo, and Frankfurter, and has been the subject of voluminous scholarly writing, it cannot be said that any clear test has yet been developed to determine which cases 'arise under' the Constitution, laws, or treaties of the United States." Wright, Federal Courts § 17, at 54–55 (2d ed. 1970). If no single test is controlling, then we must examine the several tests espoused and the different situations where federal question jurisdiction has been found.

Mr. Justice Holmes suggested that "a suit arises under the law that creates the cause of action." American Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916). But we have already seen that section 301 does not create any action, by virtue of the "no rights or liabilities" language of section 102(a) of the Act. Mr. Justice Black observed that federal question jurisdiction is present where "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another." Bell v. Hood, 327 U.S. 678, 685, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946). The *Bell* test is overbroad if viewed out of context. The *Bell* Court addressed a complaint alleging that damages were suffered as a result of F.B.I. agents imprisoning the plaintiffs in violation of their constitutional right to be free from deprivation of their liberty without due process of law, and subjecting their premises to search and their possessions to seizure in violation of their constitutional right to be free from unreasonable searches and seizures. 327 U.S. at 679, 66 S.Ct. 773, 90 L.Ed. 939. The plaintiffs' right to recover was based *squarely* on their Fourth and Fifth Amendment rights.

57. Pub.L.No.91–646, § 102(a), 42 U.S.C. § 4602(a) (1970).

327 U.S. at 681, 66 S.Ct. 773, 90 L.Ed. 939. This is the point of distinction. Plaintiffs in the instant case have no claim to a federal right; any right they may have is only a contract right. Without meaning to be presumptuous, the *Bell* test would be much improved if this distinction were included.

On occasion, where a federal statute created a duty but no remedy, the courts have "inferred" a remedy and found federal question jurisdiction. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944). Since Congress intended section 301 of the Act to be an expression of congressional policy left to faithful and proper execution by its administrators, inferring a remedy would do great violence to that intent. This we will not do. Where a federal statute expressly creates a remedy, federal question jurisdiction may be found. *Compare* Feibelman v. Packard, 109 U.S. 421, 3 S.Ct. 289, 27 L.Ed. 984 (1883), *with* Shoshone Mining Co. v. Rutter, 177 U.S. 505, 20 S.Ct. 726, 44 L.Ed. 864 (1900) (federal statute authorized suit to determine adverse claims to mining rights, but no jurisdiction since local rules or customs were to govern result). Again, the Act creates no remedy for alleged violations of the section 301 practices. Even in the absence of an express statutory right or remedy, federal law may govern because the federal interest is dominant or a pivotal question of federal law is an essential element of the case. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); Smith v. Kansas City Title & Trust Co., 225 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921). The interpretation of section 301 of the Act is of federal interest and is a pivotal question in Count II. Once again, however, we cannot avoid the intent of Congress. Section 301 is an expression of congressional policy left to faithful and proper execution by its administrators. We believe that Congress also intended the federal interest to be satisfied and the pivotal question to be resolved by those administrators. We will not frustrate that intent.

We conclude without reservation that Count II, alleging a contract right to the section 301 practices, does not present a case which "arises under" the Constitution or laws of the United States.

■ If we view Count II as a simple contract action against the Secretary, this Court does not have jurisdiction. For purposes of jurisdiction, Count II presents an action against the United States, not the Secretary. Massachusetts v. Connor, 248 F.Supp. 656, 660 (D.Mass.), aff'd 366 F.2d 778 (1st Cir. 1966). Without regard to any named defendant, a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting or compel it to act. Dugan v. Rank, 372 U.S. 609, 620, 83 S. Ct. 999, 10 L.Ed.2d 15 (1963). Plaintiffs seek specific performance and a prohibitory injunction. This relief, if granted, either would compel the government to act or restrain the Government from acting in the execution of a governmental function. Since this is a contract action against the United States, our jurisdiction is governed by the Tucker Act, 28 U.S.C. § 1346(a)(2) (1970), which allows district courts jurisdiction concurrent with the Court of Claims for contract actions against the United States only where the amount in controversy is less than $10,000. Since plaintiffs have alleged an amount in controversy greater than $10,000 in an attempt to establish federal question jurisdiction, the action may be brought only in the Court of Claims [58] and not in this Court. Massachusetts v. Connor, *supra,* 248 F.Supp. at 658.

■ Lastly, we do not have jurisdiction to enforce possible contract rights

---

58. 28 U.S.C. § 1391 (1970).

against the Commission under the allegations of Count II. Having rejected federal question jurisdiction, we look to diversity jurisdiction. If the Commission is deemed to be a citizen of the State of Missouri, diversity jurisdiction, 28 U.S.C. 1332 (1970), would be defeated because plaintiffs are also citizens of the State of Missouri. Merge v. Troussi, 394 F.2d 79, 83 (3rd Cir. 1968) (alternate holding). If, on the other hand, the Commission is deemed to be the alter ego of the State of Missouri, diversity jurisdiction would be defeated because a state is not a citizen for purposes of diversity. Minnesota v. Northern Securities Co., 194 U.S. 48, 63, 24 S. Ct. 598, 48 L.Ed. 870 (1904).

Since we do not have federal question or diversity jurisdiction, Count II of the complaint will be dismissed.

Although we do not reach the merits of plaintiffs' contract claim, we believe limited comment is appropriate. The statutory framework providing federal aid for the construction of highways establishes the existence of a contractual obligation on the part of the Government which can be enforced by a State under the Tucker Act. Massachusetts v. Connor, *supra*, 248 F.Supp. at 658. The federal aid procedures are relatively simple. The Secretary apportions among the states by a statutory formula, sums authorized by Congress to be appropriated for expenditure on the federal-aid systems. 23 U.S.C. § 104 (1970). After the apportionments state highway departments may submit programs of proposed projects for the utilization of the apportioned funds to the Secretary for his approval. 23 U.S.C. § 105(a) (1970). Following program approval, the state highway department must submit to the Secretary for his approval surveys, plans, specifications, and estimates for each proposed project in an approved program. "The Secretary shall act upon such surveys, plans, specifications, and estimates as soon as practicable after the same have been submitted, and his approval of any such project shall be deemed a *contractual obligation* of the Federal Government for the payment of its proportional contribution thereto." 23 U.S.C. § 106(a) (1970) (emphasis added). If project approval is given, "the Secretary shall enter a formal project agreement with the State highway department concerning the construction and maintenance of such project. Such project agreement shall make provision for State funds required for the State's pro rata share of the cost of construction of such project and for the maintenance thereof after completion of construction." 23 U.S.C. § 110(a) (1970). "After completion of a project in accordance with the plans and specifications, and approval of the final voucher by the Secretary, a State shall be entitled to payment out of the appropriate sums apportioned to it of the unpaid balance of the Federal share payable on account of such project." 23 U.S.C. § 121(b) (1970).

In addition to the existence of the Government's contractual obligation, it is also clear that the Commission must conform to the section 301 acquisition practices as a condition precedent to receiving federal funds. Two substantial questions remain: first, whether the Commission has a corresponding contractual obligation to conform to the section 301 practices (the traditional unilateral versus bilateral contract question); and secondly, if the Commission has such an obligation, whether third party beneficiaries are entitled to enforce the Commission's contractual obligation by an action against the United States and the Commission in the Court of Claims.[59] These are difficult questions. Since plaintiffs may well pursue

59. *Cf.* Johnson v. Redevelopment Agency, 317 F.2d 872, 874 (9th Cir. 1963) ("The federal courts have consistently held that those not parties to the contract have no standing to enforce conditions imposed on [state] agencies by the United States, although those suing would benefit from such enforcement.").

this action in the Court of Claims, we will refrain from further comment.

For the reasons stated, it is

Ordered that the complaint be, and hereby is, dismissed for lack of jurisdiction.