**NALL MOTORS, INCORPORATED, and Russell F. Mann, Plaintiffs,**

**v.**

**IOWA CITY, IOWA, Defendant.**

**Civ. No. 72–47–D.**

United States District Court, S. D. Iowa, Davenport Division.

July 7, 1975.

William L. Meardon, Iowa City, Iowa, for plaintiff Nall Motors, Inc.

William V. Phelan, Iowa City, Iowa, for plaintiff Russell F. Mann.

John W. Hayek, Iowa City, Iowa, for defendant.

## MEMORANDUM OPINION

STUART, District Judge.

This matter came on for trial on March 17, 1975. The Court, having considered the evidence and the arguments of counsel, makes the following findings of fact and conclusions of law:

I. Findings of Fact.

1. At all times material hereto, the defendant City of Iowa City (City) has been engaged in an urban renewal project under the auspices of the United States Department of Housing and Urban Development.

2. The City is the Local Public Agency responsible for the project which is known as City-University Urban Renewal Project Iowa R–14, Iowa City, Iowa.

3. In furtherance of the project the City has from time to time acquired certain properties within the project boundaries including property in which all the plaintiffs had interests.

4. The property acquired from plaintiff Russell Mann includes the land and buildings located at 216–220 East College Street, Iowa City, Iowa.

5. The property acquired from plaintiff Brown's Unique Cleaners was a leasehold interest in the property owned by Mann.

6. The property acquired from plaintiff Bakas includes the land and buildings located at 115 South Clinton Street, Iowa City, Iowa.

7. That property was subject to leasehold interests owned by persons not parties to this action.

8. No evidence was offered on behalf of any plaintiff other than Russell Mann and Nall Motors, Inc.

A. Parcel 65–13, the Mann Property.

9. In acquiring properties in the project area, the City would first attempt to purchase the interests of each person having a compensible interest in the property being acquired. If a purchase of all the interests in a property could not be arranged, the property would be obtained by condemnation.

10. In seeking to purchase a property, the City would follow either of two procedures. The Firm Initial Offer Policy applied to all properties except: (1) property owned by a governmental agency; (2) property donated to the project; (3) property which an owner would voluntarily and knowingly convey to the City at a price less than fair market value; and (4) any property with an established fair market value in excess of $100,000. Two appraisals of a property would be made and a minimum and maximum acquisition price would be determined. The minimum price would be the average of the two appraised values and the maximum price would be the higher of the two. Within this range an offering price would be determined and a nonnegotiable offer made to the property owner. If a property had a fair market value in excess of $100,000 the City would attempt to purchase it through the Conventional Market Negotiation Policy. Again, two appraisals would be obtained and the City would determine an acquisition price. This price would be submitted to HUD, and HUD would either concur or indicate the maximum price it would authorize. The City was then free to enter into negotiations with the property owner and could purchase the property at any price up to the maximum authorized by HUD.

11. Once the City had determined the price to be offered the owner of a fee interest in property being acquired, it would fill out a form denominated "Offer of Sale of Land." This form, which made the property owner the nominal offeror and the City the offeree, set out the terms and conditions of the sale and could either be accepted or rejected by the owner. The owner would also receive copies of the appraisals relied on by the City. Leasehold owners would receive a letter from the City informing them their interest had been appraised and setting forth the City's offering price therefor. They would not receive copies of the appraisals but would be invited to inspect them at the City's Urban Renewal Office.

12. If leasehold interests in a property had to be acquired, the City followed a policy of requiring that the owner or owners of the fee interest and the owners of all leasehold interests had to agree to the terms being offered them for their respective interests. If the owner of any interest was dissatisfied, then no interest in the property would be purchased. Such a policy was mandated by HUD regulations and followed by the City in hopes of obtaining the entire property in as expeditious a manner as possible.

13. Initially, the City followed an informal policy of offering property owners the higher of the two appraisals for the property interest being purchased. It is not clear from the evidence whether this policy was followed with respect to all acquisitions or only those where the maximum offering price required prior HUD concurrence. In any event, HUD criticized the City for its policy in this regard and the policy was abandoned prior to the time the City made its offer to Mann.

14. Mann's interest in the College Street property was appraised by Donald L. Johnson of Iowa Appraisal and Research Corporation and found to be worth $135,800. A second appraisal, by Don E. Williams and Larry P. Waters, of Hoffman-Waters Realtors, found Mann's interest to be worth $168,900.

15. On the basis of the two appraisals and others of the leasehold interest in

the property, the City determined the fair market value of all the interests to be $191,255.

16. Pursuant to the provisions of the Conventional Market Negotiation Policy, the City submitted this value estimate to HUD for approval. HUD rejected it, however, and indicated that the maximum amount it would authorize to be spent to acquire all interests in the property was $161,255.

17. On March 8, 1972, the City offered Mann $138,350 for his fee interest. The offer was rejected because Mann felt the price was too low and because one of his tenants, Woodburn Sound Service, indicated that it would not consent to purchase of its leasehold interest.

18. Subsequent negotiations between Mann and the City were fruitless, and, on April 4, 1973, Mann's interest was acquired by condemnation. Mann received $185,000.

19. Because of the need to proceed to condemnation, Mann incurred and paid legal fees in the amount of $6,364.63, and appraisal costs of $200. In addition, he devoted 610 hours of his own time to problems related to the City's acquisition of his property. Mann's normal fee for action as a real estate consultant is $20–$25 per hour or $200 per day.

### B. The Uneconomic Remnant

20. In addition to its property within the project area, plaintiff Nall Motors, Inc., owns a tract of land located outside of the project area on the northeast corner of the intersection of Washington and Van Buren Streets in Iowa City.

21. Nall Motors acquired this tract in 1966 for $53,900 to use in conjunction with the automotive sales business conducted at its main location some blocks to the southwest. At the time of acquisition two houses were situated on the tract. These houses were removed and the property was filled in and graveled.

22. When the City purchased its main location, Nall was forced to relocate outside the city limits at such a distance from the Washington Street property

that it is no longer feasible to use that property in connection with its business.

23. Despite repeated efforts Nall has been unable to sell the property. Currently, it is asking $48,000 for the tract and has had no offers.

### C. Stipulated Facts

24. In addition to the foregoing facts as found from the evidence, the parties have stipulated as follows:

a. All claims for relocation expense reimbursement have been satisfied and withdrawn.

b. The City commenced urban renewal activity on September 21, 1964, and on May 18, 1965, approved the execution of the contract with HUD applying to the R–14 project. The contract was amended and the City began acquiring properties in the project area in 1970.

c. On May 8, 1971, the City assured HUD that it would comply with the provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, et seq. (the Act).

## II. Conclusions of Law

In the original complaint, all the plaintiffs sought relief on the theory that the City's land acquisition policies violated Title III of the Act, and more specifically, 42 U.S.C. § 4651. On January 26, 1973, this Court ruled that § 4651 created no substantive rights and granted summary judgment against the plaintiffs on their § 4651 claims. In their post-trial memorandum plaintiffs ask the Court to reconsider this ruling. The primary authority for the request to reconsider is the case of *Bethune v. HUD* (W.D.Mo., 1972), 376 F.Supp. 1074. While it appears the court in *Bethune* did look to § 4651 for substantive guidelines, the case is unpersuasive for the court apparently did so on a third-party beneficiary theory rather than on the theory that § 4651, itself, created substantive rights. The plaintiffs were treated as donee beneficiaries of a contract between Jackson County, Missouri, and the Depart-

ment of Housing and Urban Development. Section 4651 was looked to as a provision of the contract rather than as a right-creating statute. The only mention of § 4651 as an independent source of rights is contained in the rather confusing passage quoted by plaintiffs herein in their memorandum:

> 7. [The Court finds that] Title 42, U.S.C.A., Section 4602(a) does not preclude this action for the reason that said action is not based upon rights arising under Title 42, U.S.C.A., Section 4601 et seq. but is based upon duties imposed by the administrative actions of the Department of Housing and Urban Development, the contractual relations between the Department of Housing and Urban Development and Jackson County, Missouri, *and by Title 42, U.S.C.A., Section 4651.* (Emphasis added) *Id.* at 1078.

More persuasive, by far, is the case cited by defendants, *Barnhart v. Brinegar* (W.D.Mo., 1973), 362 F.Supp. 464, *cited with approval* in *Tullock v. State Highway Commission* (8th Cir., 1974), 507 F.2d 712, 715. That case exhaustively analyzes the legislative history of 42 U.S.C. § 4602(a), which provides: "The provisions of section 4651 of this title create no rights or liabilities * * *." Based on that analysis, the Court concluded:

> From this history, we believe one conclusion is irresistable—Congress intended section 102(a) [42 U.S.C. § 4602(a)] to preclude judicial review of federal and state agency actions under the real property acquisition practices of section 301 of the Act [42 U.S.C. § 4651]. *Id.* at 472.

■ In the Court's opinion, this view of § 4651 is the correct one. Plaintiffs are entitled to no relief for the claimed violations thereof. Section 4602(a) clearly and convincingly evinces an attempt to preclude judicial review of agency action under § 4651 and, since it does so, the review provisions of the Administrative Procedure Act are inapplicable. 5 U.S.C. § 701(a)(1).

■ In addition to the § 4651 claims, plaintiff Mann claims his rights under the United States and Iowa Constitutions were violated by the City in the acquisition of his property. Mann alleges he was treated unfairly, unequally, and discriminatorily in the City's effort to acquire not only his interest in the property but that of his tenants, as well, and in the City's failure to offer him the higher of the appraisals of his interest as the City's purchase price therefor. This claim fails for lack of proof. At most, Mann's evidence establishes that some other property owners were offered the higher of two appraisals while he was not and that the City refused to make him an unconditional offer for his fee interest. The evidence also shows, however, that Mann was not the only owner of a property interest who was offered less than the higher appraised value and that such offers were made both before and after the offer to Mann. Further, Mann made no showing that he was similarly situated to those property owners who received an offer equal to the higher appraisal of their property interests or that the City, in changing its offer policy, acted arbitrarily or capriciously. Mere disparate treatment does not amount to a violation of constitutional rights, and Mann has shown nothing more than disparity with respect to the offer policy.

■ The attempted conditional acquisition, too, was constitutionally permissible. The City's policy of acquiring all or none of the interests in a property was a reasonable method of property acquisition. It was intended not as a substitute for condemnation, but as an alternative by which some properties might be obtained without the necessity for court proceedings. Mann was not denied the full panoply of rights attendant to a condemnation proceeding. Upon final rejection of the City's offer, his property interest was condemned and valued separately from those of this tenants as required by Iowa law and no challenge has been here raised to the sufficiency of that proceeding. Indeed, as a result of

proceeding to condemnation, Mann was awarded some $16,000 more than even the higher appraisal of his interest, and over $46,000 more than the City's initial offer.

■ Finally, all plaintiffs claim they are third party beneficiaries of the contract between HUD and the City. They claim that, even if direct relief under § 4651 is unavailable, the contract incorporates the provisions of that section and the City has committed an actionable breach of that contract. This claim, too, must fail, but for a different reason—the Court has no jurisdiction to consider it. The contract presents no federal question; see *Barnhart v. Brinegar, supra,* at 476; and there is no diversity of citizenship among the parties.

■ The plaintiffs urge the Court to consider the contract breach in the exercise of its discretionary pendent jurisdiction. While the exercise of such jurisdiction might be proper were there a federal claim to which the contract action would be appended; see *Lewis v. Brinegar* (W.D.Mo., 1974), 372 F.Supp. 424, 428–29; no such claim exists in this action. In the *Lewis* case, the court decided to exercise its pendent jurisdiction over a contract claim similar to the one urged here only after determining that the operative facts giving rise to the contract claim also presented the federal question of whether Title II of the Act, 42 U.S.C. §§ 4621–38, had been violated. 372 F.Supp. at 427. Here, there is no federal question of any import. Section 4651 violations are not subject to judicial review; all Title II claims were withdrawn prior to trial; and Russell Mann's constitutional claim is insubstantial to the point of being frivolous. See *Barnhart v. Brinegar,* supra, at 472 n.48. In determining not to exercise its discretion the Court is also influenced by the observation that the purported contract claim is just a § 4651 claim in common-law dress and is an attempt by the plaintiffs to render the § 4602(a) "no rights or liabilities" language a nullity. Finally, even were the Court to consider the contract claim, the plaintiffs would be entitled to no relief for the City did not violate § 4651 in acquiring the plaintiffs' properties.

■ Nall Motors has not shown the Washington Street lot to be an uneconomic remnant. Its evidence establishes only that it bought a tract with two houses on it, turned it into a vacant lot, and has not been able to sell it for what it paid for the property when it was originally acquired. The fact that a vacant lot cannot be sold for what a lot with two houses on it brought some ten years earlier is equally as consistent with the conclusion that Nall Motors is asking an artificially high price for the property as with the conclusion that the property is an uneconomic remnant. Even if the evidence had established that the lot was "uneconomic", however, the Court is of the opinion that it would not be an uneconomic remnant within the meaning of § 4651. Although it was used in conjunction with the property acquired by the City, it was neither contiguous thereto nor so closely related in use or functions to constitute a "remnant" of the acquired property within any reasonable reading of that term as used in the Act. The Court is also of the opinion that the procedures followed by the City in pricing and acquiring properties were in accord with the mandates of § 4651. Thus, there was no breach of the contract between the City and HUD and the remaining plaintiffs would be entitled to no relief on the claim that such violations occurred. Therefore,

IT IS HEREBY ORDERED that judgment be entered in this cause in favor of the defendants and that the plaintiffs take nothing on their claims herein.

IT IS FURTHER ORDERED that the costs of this action be taxed to the plaintiffs.