COURT OF APPEALS
DECISION
DATED AND FILED

July 1, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP2284**

STATE OF WISCONSIN

Cir. Ct. No. 2017CV74

IN COURT OF APPEALS
DISTRICT IV

---

ISLAND CAMPING, INC.,

    PLAINTIFF-RESPONDENT,

  V.

WISCONSIN DEPARTMENT OF TRANSPORTATION,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Pierce County: JOSEPH D. BOLES, Judge. *Reversed and cause remanded with directions.*

Before Fitzpatrick, P.J., Graham, and Nashold, JJ.

¶1 FITZPATRICK, P.J. For over thirty years, Island Camping, Inc. has operated a commercial campground on an approximately twenty-acre narrow strip of land along the Mississippi River. A bridge spanning the river between Minnesota and Wisconsin has stood over a slice of the Island Camping property

the entire time it has operated the campground. The Department of Transportation ("DOT"), through eminent domain procedures, permanently took a .64-acre portion of the Island Camping property, as well as a temporary limited easement of 1.61 acres, for the construction of a replacement bridge over the Mississippi River and demolition of the previous bridge.[1] In this lawsuit, Island Camping contends that the DOT's taking of its property left the remainder of its property as an "uneconomic remnant" within the meaning of WIS. STAT. § 32.05(3m) (2019-20)[2] and, as a result, the DOT is required by statute to purchase the remainder of the Island Camping property.[3]

¶2 Following a trial to the Pierce County Circuit Court, the court concluded that the DOT's partial taking, along with the effects of the TLE and the construction of the replacement bridge and demolition of the previous bridge, have caused the remaining Island Camping property to be an uneconomic remnant.

¶3 The DOT appeals and argues that the circuit court based its decision on "improper considerations" not within the analytical framework of WIS. STAT.

---

[1] For convenience, we refer to the DOT's permanent taking of the .64 acres as the "partial taking" and the temporary limited easement as the "TLE."

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[3] WISCONSIN STAT. § 32.05(3m) provides as follows:

> (a) In this subsection, "uneconomic remnant" means the property remaining after a partial taking of property, if the property remaining is of such size, shape, or condition as to be of little value or of substantially impaired economic viability.

> (b) If the acquisition of only part of a property would leave its owner with an uneconomic remnant, the condemnor shall offer to acquire the remnant concurrently and may acquire it by purchase or by condemnation if the owner consents.

§ 32.05(3m). The first subject area of the circuit court's purported error is the court's reliance on evidence concerning the economic viability of the Island Camping business at the remaining property. We reject that argument from the DOT and conclude that the circuit court properly considered such evidence in light of the evidence presented by the parties at trial, the specific aspects of this particular property, and the holdings of the supreme court in *Waller v. American Transmission Co., LLC*, 2013 WI 77, 350 Wis. 2d 242, 833 N.W.2d 764. The second subject area the DOT complains of is that the circuit court based its decision, in part, on evidence regarding the temporary effects of the bridge construction and demolition. We agree with the DOT that the circuit court erred in relying on the temporary problems caused by construction and demolition in coming to its conclusion that the remaining Island Camping property is an uneconomic remnant. In addition, we reject Island Camping's argument that the circuit court's error was harmless and did not affect the substantial rights of the DOT. Accordingly, we remand this matter for a new trial.

## BACKGROUND

¶4 The following facts are undisputed or, as noted, are taken from the trial evidence and the circuit court's findings of fact.

## I. Overview.

¶5 Robert and Margie Moyer have operated the Island Camping campground[4] and marina on a narrow 19.81-acre parcel along the Mississippi River for over thirty years. That property has been bisected by a bridge standing

---

[4] For ease of reading, we refer to Robert as "Moyer."

over the Island Camping property and the Mississippi River between Minnesota and Wisconsin.

¶6 Through eminent domain procedures under WIS. STAT. ch. 32,[5] the DOT condemned a portion of the Island Camping property in order to replace the bridge. More specifically, effective May 1, 2017, the DOT permanently took .64 acres from the Island Camping property for the replacement bridge. The DOT also obtained a 1.61-acre TLE for bridge construction and demolition. At the time of the June 2019 trial in this matter, it was anticipated that the replacement bridge would be completed in the year 2020.

¶7 Prior to the partial taking of .64 acres, the Island Camping campground included 108 campsites rented to seasonal and more temporary campers, along with a marina with 55 boat slips. As a result of the partial taking, Island Camping lost: the boat ramp used by patrons to place boats in the water; the fish cleaning station used by campers; 15 campsites; and 8 boat slips from the marina.

¶8 This action initiated by Island Camping against the DOT raised the issue disputed in the circuit court and this appeal: Island Camping's claim, pursuant to WIS. STAT. § 32.05(3m), that the Island Camping property is now an uneconomic remnant. We next consider pertinent evidence proffered at the court trial.

---

[5] "As a general rule, condemnation powers in Wisconsin are set out in WIS. STAT. ch. 32." *Waller v. American Transmission Co., LLC*, 2013 WI 77, ¶56, 350 Wis. 2d 242, 833 N.W.2d 764.

## II. Trial Evidence.

¶9    Moyer testified concerning the campground's physical layout, operation, financial standing, and the Island Camping property's current and future value. James Johnson, an appraiser retained by Island Camping, and Cindy White, an appraiser retained by the DOT, testified concerning, among other subjects, the impact the partial taking has had, and will have, on the value of the Island Camping property. We next summarize the material testimony of those witnesses in the context of pertinent subject matters.

### A. Loss of the Boat Ramp.

¶10    Moyer testified to the following about the loss of the boat ramp as a result of the partial taking. Without a boat ramp on the Island Camping property, the nearest boat ramp for Island Camping patrons is a two and one-half-mile drive away and a 30-minute motor boat trip back to the Island Camping property. Campers have complained about this inconvenience. Moyer explained that, to now build a new boat ramp at another spot on the Island Camping property, Island Camping must obtain permits from Pierce County, the Department of Natural Resources, and the Army Corps of Engineers. Moyer has experience with these types of permits and had what he considered to be a frustrating time getting the permit for the Island Camping marina, with the process taking three years. Moyer expressed his opinion that there is "[z]ero" chance of Island Camping obtaining the necessary permits to build a new boat ramp at its property.

¶11    In order to form his opinions, Johnson interviewed local and state actors that would have to approve permits for a new boat ramp at the Island Camping property. Based on those interviews, Johnson testified that it is "reasonably probable that [Island Camping] will not be given" permits for a new

boat ramp. Johnson also surveyed five campground owners. Each of those owners stated to Johnson that the loss of direct water access through a boat ramp would be damaging to any campground that may try to operate at the Island Camping property in the future.

**B. Loss of the Fish Cleaning Station.**

¶12    Moyer testified as follows regarding the loss of the Island Camping fish cleaning station as a result of the partial taking. Without a fish cleaning station, campers are forced to throw fish guts from cleaning fish into the woods or in the garbage, and that makes the campground smell. Island Camping took steps to replace the fish cleaning station by contacting the Pierce County zoning office. But, that office will not allow Island Camping to put in a new station due to a floodplain in that area. Losing the fish cleaning station has made campers unhappy, and some have moved out for that reason.

¶13    Johnson testified to the following about the fish cleaning station. Five campground owners informed Johnson that, without a place to dispose of the remains of fish that are caught and cleaned, the smell and flies would likely be so bad as to force any campground to close. Johnson opined that another fish cleaning station cannot be built on the Island Camping property because that area is in a flood zone.

¶14    White did not form an opinion on the likelihood that a permit could be obtained by Island Camping for another fish cleaning station.

**C. Effects of the Partial Taking, TLE and Construction.**

¶15    Moyer testified to the following regarding the effects of the partial taking, TLE and construction on the Island Camping business. The camping

season runs from May 1st to November 1st each year. Moyer explained that Island Camping traditionally had three kinds of campsites: seasonal, monthly, and "weekenders." "Weekenders" were important to Island Camping because they paid about four times more per night than seasonal campers. Moyer made the business decision to end all weekend camping and marina slip rentals during construction of the bridge, and, instead, Island Camping has required a minimum stay of at least one month.

¶16 Fill from a temporary causeway created as part of the bridge construction caused water to back up in certain campsites when it rained. Rain water drained into the river before that causeway was built. Moyer also testified that the bridge construction made the campground "look like heck." Island Camping's counsel asked Moyer: "What impacts from construction [of the bridge] do you anticipate facing in the future?" Moyer answered in pertinent part: "It's going to get a lot worse because if you think the noise of building a bridge is loud, the noise of demolishing one is louder and there's [another] year of that coming up."

¶17 As noted, following the partial taking, the campsites for rent were reduced in number from 108 to 93. For the ten to fifteen years prior to the partial taking and construction, Island Camping never had vacancies and had a wait list for campsites during that time. After the partial taking and after construction began, starting in 2018, Island Camping had vacancies and no wait list. More specifically, in 2017, 93 sites were rented; in 2018, 87 sites were rented; and by the time of the June 2019 trial, only 60 campsites were rented so far in that year.

¶18 Since 2017, Island Camping's profits have decreased and, in 2019, Moyer did not expect any profit. Moyer attributed the decrease in profits to losing

"overnighters" and lines of business. Moyer was asked: "What does this exhibit 7 [(a summary of decrease in profits)] tell you about the impact of the DOT taking on the Island Campground?" He answered: "Well, I think that the impact is totally due to the construction." Moyer also testified that the "majority of the damages" to Island Camping's business he attributes to the "construction period and the inconveniences associated with that." Moyer acknowledged at trial that the campsites in the area of the TLE will become usable again after construction. Moyer testified that it was "possible" to continue to operate the Island Camping campground, but it would take "another [Moyer] that was willing to put a 15[-]year plan together [to make it] a good campground to buy."

### D. Highest and Best Use, and Before and After Value.

¶19 White testified to the following regarding the highest and best use, and value, of the Island Camping property.[6] Before and after the partial taking, the highest and best use of the Island Camping property is "improved commercial with a campground." White concluded that the value of the property before the partial taking was $1,836,000, and after the partial taking the value will be $1,761,795. White agreed that it would impact the value of the property if Island Camping does not obtain the necessary permits to replace the boat ramp. But, she did not have an opinion as to the value of the property if a new boat ramp cannot be built. White also did not develop an opinion regarding the value of the property if it is not possible to rebuild the fish cleaning station.

---

[6] *See* **State ex rel. Collison v. City of Milwaukee Bd. of Rev.**, 2021 WI 48, ¶37, 960 N.W.2d 1 ("[W]e begin with the proposition that 'real estate must be valued at its highest and best use.'").

¶20    Johnson agreed with White that the highest and best use of the Island Camping property prior to the partial taking was as a commercial campground. Johnson concluded that the property was worth $1,944,000 ($108,000 more than White's opinion) before the partial taking. Johnson stated that the Island Camping property can no longer be profitably used as a campground and marina. Johnson opined that the property's highest and best use changed to privately owned recreational land because of the loss of the boat ramp and fish cleaning station. Johnson concluded that the value of the Island Camping property as privately-owned recreational land is $104,463.

¶21    In Moyer's opinion, the property was worth $2 million before the DOT partial taking, the TLE and the construction. He testified that it is not economically viable for him to continue to run the Island Camping campground. Moyer also testified that the property is now nonbuildable vacant land, decreasing the value to $8,000 per-acre (the price of farmland in Moyer's view), or about $150,000 total.

### III.  Findings and Conclusions.

¶22    The circuit court made findings and conclusions germane to our review which we now consider.

¶23    The circuit court framed the question before it as whether the Island Camping property "remaining is of such size, shape, or condition as to be of … substantially impaired economic viability" pursuant to WIS. STAT. § 32.05(3m).[7]

---

[7] The statute at issue in this case, WIS. STAT. § 32.05(3m), pertains to uneconomic remnants and applies when a condemnation is for "transportation facilities." By contrast, WIS. STAT. § 32.06(3m), which also pertains to uneconomic remnants, applies when the condemnation is for a purpose "other than transportation matters."

(continued)

9

The circuit court also stated that the "use" of the property is "crucial" to determining the "value of the property." More particularly regarding the use of the Island Camping property, the circuit court stated that it was "required to look at … the circumstances," and "many factors … weighed in favor of the taking causing significant loss to the businesses, in particular the camping business."

¶24　The circuit court made findings regarding the effects of the partial taking, TLE, and bridge construction which we now summarize.

## A.　Highest and Best Use, and Value, of the Property.

¶25　The circuit court discussed the Island Camping property's highest and best use, and the value of the property, pre-taking and post-taking. The circuit court found credible the opinions of Johnson and White that, pre-taking, the highest and best use of the property was as a commercial campground, as well as those experts' similar pre-taking value determination of the Island Camping property at approximately $1,900,000. The court "criticized" Johnson's opinion about the post-taking value of the Island Camping property and Johnson's "ultimate appraisal." The court found that Johnson's opinion that the highest and best use of the property after "the taking" as private recreational property "didn't make sense." Immediately thereafter, the circuit court found:

> I think there is probably some economic viability if you can get that property purchased for the right amount and … given the business and profits being reduced [it] certainly isn't worth what it was at the time of the taking. But if somebody is able to purchase that at a price that wouldn't

In giving its decision on the record, the circuit court misspoke and referred to the applicable statute as "32.06 subdivision 3m." That makes no difference to our analysis because the language of WIS. STAT. § 32.05(3m) is identical to the language of WIS. STAT. § 32.06(3m). *Waller*, 350 Wis. 2d 242, ¶63 n.19.

create debt that would be smothering, I think it could be a
viable business ….

The circuit court did not make findings regarding the dollar value of the Island Camping property post-taking or Moyer's opinion that the value of the Island Camping property is $150,000 post-taking.

## B. Boat Ramp.

¶26    The circuit court recognized the factual dispute about whether the campground permanently lost the boat ramp as a result of the partial taking. The court found that three governmental entities must approve a new boat ramp for Island Camping's property and that Island Camping had not formally submitted an application for a new boat ramp to any of those entities. Based on the testimony of Moyer and Johnson the court found that, "to a greater weight of the credible evidence," Island Camping had shown that it "had very little chance of getting" permits to build a new boat ramp.

## C. Fish Cleaning Station.

¶27    The circuit court also considered the loss of the fish cleaning station because of the partial taking. The court pointed to Moyer's testimony that "the campground … always catered to fisherm[e]n." The court stated that Johnson also testified that the fish cleaning station "was very important to the economic viability of the campground after the taking." The court further found:

> [C]ampers primarily were there for purposes of fishing. And to not have a fish cleaning station was crucial to the business in terms of satisfying the customers. You [must] have a spot to clean fish where you can kind of keep the smell away from the other campers and direct campers to that area to clean their fish.

11

## D. Negative Effects of the Partial Taking, Bridge
## Construction, and Demolition.

¶28    As noted, the circuit court rejected Johnson's opinions about the highest and best use of the property after the taking and the post-taking value of the property. However, the court found Johnson's testimony to be more credible than White's testimony in terms of the impact of various "problems" arising from the partial taking and construction. The court stated:

> I do feel that [Johnson's] analysis and his recognition of the [effect] of the problems on the value on the business, economic business issues … was … the more credible of the experts with regard to those findings ….

¶29    The circuit court further found that Moyer's testimony about operating a campground business was "very credible." The court stated:

> [Moyer] was the primary fact witness about the business…. [Moyer's testimony] was intelligent, reasonable and extremely credible in my view. He made sense. He … is very intelligent with the ability to analyze situations and I think he's shown by the development and operation of the campground over the past 30 years that he is quite an astute businessman … and he knows … the campground business and the marina business ….

¶30    The court noted that the DOT was critical of the business decision made by Moyer that, during the construction, profitable rentals for weekend and other short-term campers have been eliminated. But, the circuit court found that Moyer's business decision in doing so was reasonable.

¶31    The circuit court explicitly addressed disruptions in the Island Camping business that have arisen during the bridge construction. The court recognized that the "actual end loss in terms of acreage" is .64 acres, and the construction was "still ongoing" at the time of trial with a 1.61-acre TLE "taken

for a temporary and limited basis." The circuit court acknowledged the DOT's objection to the court considering the temporary effects of construction: "[T]he [DOT] argued quite strenuously that I was not to consider inconvenience and that during construction damage is not to be considered." In rejecting the DOT's argument, the court stated that the campground's losses during construction "must be considered in determining … whether or not there is economic viability … and to determine substantially impaired economic viability," the court is "required to look at what was lost as to economic viability during the taking and during the construction period and that includes the construction period …."

¶32   The circuit court made findings concerning temporary effects on the campground business at the Island Camping property because of the bridge construction. The court found that the construction had caused "drainage issues from the causeway causing water to back up [into the campground] during rain storms." The court also found that the continuing road construction "creates noise" and that "there's no peace for the campers [at Island Camping] because the ongoing noise and future construction, which includes the demolition of the old bridge, will be very loud and affects the desirability of that campground for campers." The court further found that the "ongoing" bridge construction "has affected the business of the campground in terms of its economic viability" which "is show[n] by the fact that there was a … fairly significant waiting list [for campsites] up until the time of the taking, after which … the waiting list has disappeared and there are in fact now vacancies. I think that shows that the decline of the campground which is a result of the taking is fairly obvious." The court credited Moyer's testimony that Island Camping was "going backwards from a business standpoint here from the time of the taking and even into the future until completion of the construction, the business has taken a hit money-wise,

profit-wise, income-wise but beyond that reputation[-]wise." The circuit court specifically included the "construction issues" in the factors that made the Island Camping "business way less valuable after the taking than it was before."

¶33 The court found that "the taking" "resulted in a loss of reputation [for the Island Camping business], which will take many years to remedy," and it will be "very hard to get that back," and that caused a "fall in [Island Camping's] business." The court further found that there were no campsite vacancies at Island Camping in 2016 and 2017, in 2018 there were 6 vacancies, and in 2019 there were 33 campsite vacancies as of the time of the June 2019 trial. Island Camping's gross income between the years 2014 and 2018 was as follows: $223,382 in 2014; $242,173 in 2015; $224,244 in 2016; $226,413 in 2017; and $194,996 in 2018; with no figures available for 2019 at the time of trial.

¶34 The circuit court concluded its decision by stating that Island Camping had shown "by a greater weight of the credible evidence" that the Island Camping property remaining after the taking "is of a … substantial[ly] impaired economic viability such that it is … under Wisconsin law an uneconomic remnant."

¶35 Other material facts will be discussed later in this opinion.

**DISCUSSION**

¶36 The parties raise two principal issues in this appeal. First, the DOT argues that the circuit court erred by considering "improper" factors when it applied the provisions of WIS. STAT. § 32.05(3m) to the facts of this case. Second, Island Camping argues that any such error by the circuit court is harmless because

the remaining evidence properly considered by the circuit court is sufficient to affirm the decision of the circuit court. We address each issue in turn.

### I. Standard of Review and Interpretation of Statutes.

¶37 We begin by discussing our standard of review and principles regarding the interpretation of statutes.

¶38 Whether the property remaining after a partial taking is of "substantially impaired economic viability" is a question of fact for the circuit court to resolve. *Waller*, 350 Wis. 2d 242, ¶101. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Id.*, ¶52 (quoting WIS. STAT. § 805.17(2)). The circuit court was also required to apply the statutory provisions of WIS. STAT. § 32.05(3m) to the facts of this matter. "The application of a statute to the facts of the case is a question of law that we review de novo." *Waller*, 350 Wis. 2d 242, ¶52; *see also **Emer's Camper Corral, LLC v. Alderman***, 2020 WI 46, ¶16, 391 Wis. 2d 674, 943 N.W.2d 513 (noting that whether the circuit court applied the proper legal standard is a question of law this court reviews de novo).

¶39 In this appeal, we must interpret WIS. STAT. § 32.05(3m). Statutory interpretation is a question of law reviewed de novo. *Waller*, 350 Wis. 2d 242, ¶51.

> "The purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." ***Heritage Farms, Inc. v. Markel Ins. Co.***, 2012 WI 26, ¶26, 339 Wis. 2d 125, 810 N.W.2d 465 (internal brackets and citation omitted). Statutory interpretation "begins with the language of the statute." ***State ex rel. Kalal v. Circuit Court for Dane Cnty.***, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110

> (internal quotation marks omitted). Courts give statutory language its common, ordinary meaning. *Id.* Statutory language is interpreted in the context in which it is used, not in isolation but as part of a whole. *Id.*, ¶46. We must construe statutory language reasonably, so as to avoid absurd results. *Id.* Legislative history may be relevant to confirm a statute's plain meaning. *Id.*, ¶51.

*Waller*, 350 Wis. 2d 242, ¶71. Our supreme court instructs that rules of construction for eminent domain statutes must guide our interpretation of WIS. STAT. ch. 32:

> Because the power of eminent domain under WIS. STAT. ch. 32 is extraordinary, we strictly construe the condemnor's power ... while liberally construing provisions favoring the landowner, including available remedies and compensation.

*Waller*, 350 Wis. 2d 242, ¶72 (citations and quotation marks omitted).

## II.  Eminent Domain Procedures Generally.

¶40    Wisconsin's eminent domain procedures give context to our discussion and the claims made by Island Camping. The *Waller* court stated:

> A "taking"—or condemnation—of private property for public use requires the award of just compensation under both the United States and Wisconsin constitutions.

*Id.*, ¶55 (citations omitted).

¶41    WISCONSIN STAT. § 32.05 provides separate tracks for challenges to a taking of private property. One track concerns right-to-take actions—in other words, challenges to the taking itself. The gist of an uneconomic remnant claim is that it is improper for the condemnor to be allowed a partial taking of property if the remainder of the parcel would be an uneconomic remnant under the statute. In such cases, the condemnor must purchase the entire parcel. An uneconomic

16

remnant claim is properly brought through a right-to-take action, and such action does not prevent the condemnation from moving forward. *Waller*, 350 Wis. 2d 242, ¶6.

¶42 Another track concerns just compensation proceedings—that is, challenges to the amount of compensation offered by the condemnor. Just compensation may include severance damages. *See* Wis. Stat. § 32.09(6)(e). Severance damages are "the diminution in the fair market value of the remaining land that occurs because of [a] taking." *Justman v. Portage Cnty.*, 2005 WI App 9, ¶1 n.2, 278 Wis. 2d 487, 692 N.W.2d 273 (citation omitted).

¶43 Island Camping brought this right-to-take action pursuant to Wis. Stat. § 32.05(5). In the alternative to the right-to-take action, Island Camping also brought a just compensation challenge requesting damages based on the partial taking. That claim has been stayed pending resolution of Island Camping's right-to-take action.

### III. Legislative History.

¶44 As noted, our supreme court in *Waller* stated that legislative history assists in interpreting Wis. Stat. § 32.05(3m). *Waller*, 350 Wis. 2d 242, ¶71.[8] We now consider legislative history pertinent to our analysis.

> The uneconomic remnant statute, Wis. Stat. § [32.05](3m) … was the product of the legislature's Special Committee on Eminent Domain (Special

---

[8] The statutory subsection at issue in *Waller* was Wis. Stat. § 32.06(3m) but, as already noted, the provisions of Wis. Stat. §§ 32.05(3m) and 32.06(3m) are identical. *Waller*, 350 Wis. 2d 242, ¶63 n.19. The parties agree that *Waller* is pertinent to the interpretation of § 32.05(3m), and neither party argues that that statutory subsection is subject to a different interpretation than § 32.06(3m).

Committee), under the auspices of the Wisconsin Legislative Council.

… [T]he Special Committee[] members considered separate draft legislation on various topics that would eventually lead to several bills, including [WIS. STAT. § 32.05(3m)], enacted as Chapter 440 of the Laws of 1977…. The summary of proceedings indicates that the draft legislation would "allow[] condemnors to acquire uneconomic remnants" and that the draft was based on Section 208 of the Uniform Eminent Domain Code.

*Waller*, 350 Wis. 2d 242, ¶¶73-74 (internal citations omitted).[9]

¶45     In *Waller*, our supreme court considered changes made by the legislature to MODEL EMINENT DOMAIN CODE § 208 (UNIF. L. COMM'N 1974) in enacting WIS. STAT. § 32.05(3m):

Section 208 [(of the Model Code)], titled "Offer to Acquire Uneconomic Remnant," reads as follows:

….

(b) "Uneconomic remnant" as used in this section means a remainder following a partial taking of property, of such size, shape, or condition as to be of little value or *that gives rise to a substantial risk that the condemnor will be required to pay in compensation for the part taken an amount substantially equivalent to the amount that would be required to be paid if it and the remainder were taken as a whole*.

The Special Committee replaced the above emphasized language with the more succinct phrase "substantially impaired economic viability."

*Waller*, 350 Wis. 2d 242, ¶75 (internal citation omitted).[10]

---

[9] "The National Conference of Commissioners on Uniform State Laws officially changed the Uniform Eminent Domain Code to a Model Act in 1984. Model Eminent Domain Code, 13 U.L.A. 1 (2002)." *Waller*, 350 Wis. 2d 242, ¶74 n.21.

¶46  Accordingly, as stated above, WIS. STAT. § 32.05(3m)(a) enacted by our legislature provides as follows:

> (a) In this subsection, "uneconomic remnant" means the property remaining after a partial taking of property, if the property remaining is of such size, shape, or condition as to be of little value or of substantially impaired economic viability.

¶47  With that legislative history in mind, we discuss a contention of the DOT. The DOT points out that, according to *Waller*, WIS. STAT. § 32.05(3m) is "based on" § 208 of the Model Code, and the legislature "replaced" a longer phrase in the Model Code with the "more succinct phrase" "substantially impaired economic viability." *Waller*, 350 Wis. 2d 242, ¶¶74-75. From that, the DOT contends that our supreme court has held that the "more succinct phrase" in § 32.05(3m) is identical in meaning to the longer phrase from the Model Code it replaced.

¶48  We reject the DOT's attempted extension of *Waller* for the following reasons. First, in *Waller* the supreme court did not discuss any reason that the legislature changed the Model Code language regarding uneconomic remnants. Put another way, our supreme court has not adopted the DOT's position that the Model Code provision is identical in meaning to WIS. STAT. § 32.05(3m). As a result, we discern the intent of the legislature through: the explicit holdings of *Waller*; the statutory language drafted by the legislature; and the Special Committee on Eminent Domain's generalized statement recognized in *Waller* that the language in § 32.05(3m) is "based on" § 208 of the Model Code. Second, the

---

[10] We observe that, in WIS. STAT. § 32.05(3m)(a), the legislature also replaced the phrase "a remainder following a partial taking of property" in the Model Code with the phrase "the property remaining after a partial taking of property, if the property remaining is."

legislature adopted the Special Committee's re-writing of that Model Code provision. As already noted, the legislature kept only the phrases "partial taking of property" and "of such size, shape, or condition as to be of little value" from the Model Code language for § 32.05(3m). That wholesale redrafting of the Model Code language undercuts the DOT's position that the Model Code and § 32.05(3m) are identical in meaning. Third, the longer phrase in the Model Code the DOT's argument refers to is narrow in that it focuses only on a comparison of the amounts the condemnor would be required to pay for the "part taken" as compared to the amount required to be paid for the "whole" "remainder" and "part taken." *See* MODEL EMINENT DOMAIN CODE § 208(b) ("[T]hat gives rise to a *substantial risk* that the condemnor will be *required to pay in compensation for the part taken* an amount *substantially equivalent to the amount* that would be required to be paid *if it and the remainder were taken as a whole*.") (emphasis added). As we will discuss shortly, our supreme court in *Waller* has interpreted § 32.05(3m) such that the before-taking and after-taking value of the property is an important factor in the analysis, but that is not the only factor as it is in the provision in the Model Code. That holding in *Waller* cannot be reconciled with the DOT's interpretation of the phrase "substantially impaired economic viability" as being identical in meaning to the longer phrase in the Model Code rejected by the legislature. Fourth, the Model Code provision requires that, for the remaining property to be an uneconomic remnant, the values of the "part taken" and the "whole" including the "remainder" must be "substantially equivalent" in amount. Put another way, the "remainder" must be of minimal value. Again, as will be discussed shortly, that definition of uneconomic remnant cannot be reconciled with the holdings of *Waller*.

20

## IV. Statutory Issue in This Appeal.

¶49    For further context, we now consider the specific statutory issue raised in this appeal.

¶50    We observe that WIS. STAT. § 32.05(3m) could reasonably be read as meaning that an "uneconomic remnant" exists if "the property remaining is of such size, shape or condition as to be of little value." According to this reading of the statute, the phrase "such size, shape or condition" would only modify the phrase "little value," not the phrase "substantially impaired economic viability." However, both the majority and the dissent in *Waller* read the phrase "such size, shape or condition" as referring to both the phrase "little value" and the phrase "substantially impaired economic viability." *Waller*, 350 Wis. 2d 242, ¶¶101, 119, 181. As a result, an uneconomic remnant may exist if the property remaining is "of such size, shape or condition as to be of … substantially impaired economic viability."

¶51    Next, neither the parties nor the circuit court mention in their discussions the phrase "little value" as used in WIS. STAT. § 32.05(3m). So, our focus is on the alternative phrase in the statute, "substantially impaired economic viability."

¶52    Further, neither the parties nor the circuit court have based their analyses on the "size" or "shape" of the Island Camping "property remaining" after the partial taking. WIS. STAT. § 32.05(3m). From that, we conclude that the size and shape of the Island Camping property remaining after the partial taking is not materially different than the size and shape of that property before the partial taking. We concentrate our discussion, as have the parties, on the "condition" of the Island Camping property.

¶53    Accordingly, the statutory question under WIS. STAT. § 32.05(3m) raised in this appeal is whether the Island Camping property remaining after the partial taking is of such condition as to be of substantially impaired economic viability.[11]

## V. *Waller*.

¶54    Because our supreme court's opinion in ***Waller*** is consequential to our analysis, we briefly recount the facts of that case and the pertinent holdings of that opinion.

### A. Material Facts.

¶55    The Wallers owned a 1.5-acre triangular lot that included a single-family residence bounded on the east by an interstate highway, on the north by a road, and on the west by a vacant lot. ***Waller***, 350 Wis. 2d 242, ¶11.   The condemnor, American Transmission Company ("ATC"), had an existing transmission line easement on the north side of the property but widened "the easement to 45 feet—an extension of 25 feet over the existing easement." ***Id.***, ¶19.  ATC also took a second easement, 45 feet wide, that ran along the east side of the property within the 50-foot highway setback. ***Id.***   In addition, ATC installed a large utility pole in the northeast corner of the property to support conductor wires and distribution lines. ***Id.***   By the time of the partial taking, "nearby land that was once agricultural became an industrial park." ***Id.***, ¶¶11, 13.

---

[11]  "Property" is defined in WIS. STAT.§ 32.01(2) as including "estates in lands, fixtures and personal property directly connected with lands."  *See also* ***United America, LLC v. Wisconsin DOT***, 2021 WI 44, ¶12, 397 Wis. 2d. 42, 959 N.W.2d 317.

The Wallers claimed that those actions diminished the value of their property so substantially that they were left with an uneconomic remnant. *Id.*, ¶2.

¶56 The circuit court found that:

> [T]he [Waller] property suffered "substantially impaired economic viability" because [of the substantial reduction of the value of the property]; … [and] the taking made the value of the residential improvements obsolete because the highest and best use after taking was vacant industrial land; … [and] after the activation of both transmission line[s], the Wallers experienced regular electronic interference that prompted concern for themselves, their family, and potential buyers; and … the removal of shrubbery and trees within the easement "substantially reduced the attractiveness of the site" and eliminated a sound barrier between the home and [the interstate].

*Id.*, ¶42. The supreme court agreed with the circuit court that, because of the partial taking, the Waller property became an uneconomic remnant. *Id.*, ¶7.

### B. Pertinent Holdings.

¶57 We now discuss the pertinent holdings of the supreme court's opinion in *Waller*.

¶58 First, in *Waller*, the supreme court drew clear distinctions between WIS. STAT. § 32.05(3m) and uneconomic remnant statutes of other states, and those distinctions illuminate the subsection's meaning. The court concluded that statutes in Oregon and Virginia defined "uneconomic remnant" as land "with no practical value or utility," and as "unusable" and "valueless." *Waller*, 350 Wis. 2d 242, ¶103 (citing *Lake Oswego v. Babson*, 97 Or. App. 408, 776 P.2d 870 (1989); *Spotsylvania Cnty. v. Mineral Springs Homeowners Ass'n*, No. CL02-391, 2003 WL 21904116 (Va. Cir. Ct. July 18, 2003)). Drawing a contrast with those statutes, our supreme court stated that the language "economic viability has been

23

substantially impaired" in § 32.05(3m) is a "broader definition" than the statutory definitions in Oregon and Virginia because the applicable Wisconsin statute allows for the conclusion that "property constitutes an uneconomic remnant even though it is not valueless." *Waller*, 350 Wis. 2d 242, ¶103.[12]

¶59     Second, the *Waller* court continually returns to the point that a loss in value of the property post-taking, as compared to the pre-taking value, is a factor in determining whether the remaining property is an uneconomic remnant. *Id.*, ¶¶7, 20, 21, 22, 42, 95, 102, 119 (as examples, appraisals indicating a 57 percent and 88 percent loss of value "are indicative of substantial economic impairment," and "substantially diminished" "value" of the property is a factor to consider in determining if a property is an uneconomic remnant). However, as alluded to above, a change in value of the property after the partial taking is not dispositive. The *Waller* court stated, "[t]he existence of an uneconomic remnant will not always turn on the percentage of land or the percentage of value taken by the condemnor. The existence of an uneconomic remnant almost always turns on the economic viability of what is left after the taking." *Id.*, ¶95 n.25.[13]

---

[12] In addition, that interpretation of WIS. STAT. § 32.05(3m) by the supreme court necessarily means that the phrase "little value" as used in § 32.05(3m) has a meaning different than "substantially impaired economic viability." That conclusion is bolstered by the legislature's use of two separate phrases in that statutory subsection. *Johnson v. City of Edgerton*, 207 Wis. 2d 343, 351, 558 N.W.2d 653 (1996) (holding that when the legislature uses different words in the same section of a statute, this court presumes that the legislature intended each word to have a distinct meaning).

[13] This court has recognized the same:

(continued)

¶60    Third, a change in the highest and best use of the property after the partial taking is a factor a court considers in determining if a partial taking has caused the remaining property to become an uneconomic remnant. *Id.*, ¶¶20, 22, 42, 97. In a similar vein, a court may consider whether there are restrictions or limits on the use of the property caused by the partial taking. *Id.*, ¶¶22, 42, 99, 100, 102 (noting that the property "could no longer sustain its previous use as a residential property," that "[t]he two 45-foot-wide easements restrict the property's use for industrial or residential purposes," and that the appraisals "reveal a picture of a property so dramatically affected by the easements that it has limited residential and industrial use after the taking").

¶61    Finally, a court also considers the attractiveness to a potential purchaser, and the usability, of the property remaining after the partial taking to a potential purchaser. *Id.*, ¶100 ("[A] reduced sound barrier between the residence and [a highway] and perceived electromagnetic disturbances … would likely rattle any potential buyer [and] further diminish the attractiveness and usability of the property."). A court also takes into account the desirability and practicality of the property. *Id.*, ¶119 (stating that the partial taking "substantially diminished the

> A $10 million property subjected to a partial taking leaving a $100,000 property might be an uneconomic remnant, whereas the partial taking of a $150,000 property leaving a $100,000 property might not be an uneconomic remnant. The reverse could also be true depending upon the facts and circumstances of each case.… [T]he inquiry does not end once the dollar value of the remaining property is determined—a circuit court is also expected to examine whether the partial taking "substantially impaired [the] economic viability" of the property.

*Waller v. American Transmission Co., LLC*, 2011 WI App 91, ¶15, 334 Wis. 2d 740, 799 N.W.2d 487.

desirability [and] practicality … of the Wallers' property for either a residential or industrial user").

¶62    We next discuss the DOT's arguments regarding purported errors of the circuit court.

## VI.  Evidence Concerning the Island Camping Business.

¶63    The DOT first argues that the circuit court erred in basing its decision in part on evidence regarding the viability of the Island Camping campground business at the remaining property rather than the economic viability of the property itself.  Prior to discussing that argument, we resolve two preliminary matters raised by the parties concerning this issue.

¶64    Island Camping asserts that, because the DOT did not object at trial to the admission of evidence regarding the viability of the Island Camping business at this property, the DOT has then forfeited any objection to the circuit court's reliance on that evidence in its decision.  In response, the DOT asserts that it argued in post-trial briefing that the circuit court cannot properly consider in its decision evidence of the viability of the Island Camping business at this property and instead must consider the economic viability of the property itself.  We agree that the DOT made such arguments in its post-trial briefing, and those arguments post-trial to the circuit court properly preserved the DOT's position.

¶65    Next, several times in briefing in this court the DOT contends that Island Camping should seek damages in a just compensation proceeding rather than the relief requested in this right-to-take action.  We reject the DOT's contention because, as discussed, the issue in this appeal is only whether the condition of Island Camping's property remaining after the partial taking is of

26

substantially impaired economic viability and, therefore, an uneconomic remnant under WIS. STAT. § 32.05(3m). *See Waller*, 350 Wis. 2d 242, ¶90 (stating that an uneconomic remnant determination should, whenever reasonably possible, precede compensation questions). Moreover, the supreme court has held that an uneconomic remnant claim is "fundamentally different" than an action that decides the amount of damages caused by a taking. *Id.*, ¶90. Accordingly, DOT's arguments that Island Camping should instead seek a damage award in a just compensation proceeding does not change our analysis or view of the facts in any material way.

¶66 We now discuss, and reject, the DOT's substantive arguments regarding this purported error of the circuit court.

¶67 First, according to the DOT, one facet of the circuit court's alleged error in not focusing on the remaining property is that the court refused to consider "industrial" uses for the Island Camping property as were considered for the property in *Waller*. In *Waller* there are references to "industrial" uses of the property after the partial taking because the Waller property was located next to an industrial park, and the experts who testified in that case agreed that the highest and best use of the property after the partial taking was for "industrial" purposes. *Id.*, ¶¶7, 13, 20, 22, 42, 97, 99, 119. Nothing in *Waller* mandates a court's consideration of industrial uses for property post-taking in an uneconomic remnant action. In addition, the DOT cites to no evidence in the record concerning use of the remaining Island Camping property for any industrial purpose. We disagree with the DOT's contention that *Waller* requires that, in every case in which there is a purported uneconomic remnant, a court must consider "industrial" uses of the remaining property.

¶68 Second, the DOT argues that the circuit court's decision contradicts the requirements of WIS. STAT. § 32.05(3m) because a comment to § 208 of the Model Code states that the remaining property is an uneconomic remnant only if it "preclude[s] economically practicable use for any plausible application." We reject this argument because the DOT's reliance on one phrase in a comment to the Model Code cannot be reconciled with the holdings in *Waller* already discussed which establish that the remaining property can have some economically practicable application and yet be an uneconomic remnant under § 32.05(3m). *See, e.g.*, *Waller*, 350 Wis. 2d 242, ¶103 (stating that property can be an uneconomic remnant "even though it is not valueless"). Moreover, that language in the comment is not part of the statute drafted by the legislature, and we will not graft language onto a statute that the legislature has not accepted. *Brey v. State Farm Mut. Auto. Ins. Co.*, 2020 WI App 45, ¶14, 393 Wis. 2d 574, 947 N.W.2d 205 ("In addition, courts should not add words to, or subtract words from, a statute to give it a certain meaning.").[14]

¶69 Third, the DOT argues that the circuit court's decision contradicts what the DOT perceives as a requirement in *Waller* that uneconomic remnant claims be decided "promptly" by circuit courts. But, the DOT does not coherently explain this conclusory assertion and makes no viable argument that this case was not decided "promptly" by the circuit court. Therefore, we do not accept that undeveloped argument. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d

---

[14] The DOT also asserts that the circuit court's decision to purportedly focus on the Island Camping business rather than the property itself contradicts a comment to the Model Code concerning "rental income." However, other than making a conclusory assertion of its applicability, the DOT gives us no basis to conclude that the language in that comment is reflected in WIS. STAT. § 32.05(3m) or how that comment is related to the facts of this case.

633 (Ct. App. 1992) (stating we need not address insufficiently developed arguments).

¶70    Fourth, the DOT contends that the circuit court erred in relying on "irrelevant evidence" because the circuit court's finding that Island Camping would not be able to obtain permits for a new boat ramp was based on "subjective business decisions" by Moyer.   The circuit court gave weight to Moyer's testimony that there was "zero" chance of getting those permits.  It was the circuit court's prerogative to weigh the evidence and determine whether Island Camping would be able to obtain the necessary permits from the three governmental entities to replace the boat ramp.  "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."  *Waller*, 350 Wis. 2d 242, ¶52 (quoting WIS. STAT. § 805.17(2)).   Further, as pointed out by Island Camping, the DOT proffered no evidence at trial to establish that there was a viable chance that Island Camping could obtain those permits.

¶71    Fifth, the DOT contends that the circuit court erred in basing its decision in part on evidence regarding the viability of a campground business because the applicable statute mentions only the "property remaining" rather than a business operating at that same property.  WIS. STAT. § 32.05(3m).  However, the DOT concedes as it must that a circuit court, in making its determination as to whether remaining property is an uneconomic remnant, may consider the highest and best use of the property before and after the partial taking.  *Waller*, 350 Wis. 2d 242, ¶¶20, 22, 42, 97 (stating that a change in the highest and best use of the property before and after the partial taking is a factor a court considers in determining if a partial taking has caused the remaining property to become an uneconomic remnant).  Here, as already discussed, the DOT's own expert opined

29

that the highest and best use of the Island Camping property both before and after the partial taking is as a commercial campground. Indeed, the DOT proffered no evidence that the remaining property's highest and best use now or in the future is anything other than as a commercial campground. Accordingly, *Waller* and the DOT's own factual position inexorably tie the uneconomic remnant question to the historical use of the property as a commercial campground and whether it may be used in that manner in the future.

¶72 Consistent with the holding of *Waller*, a circuit court may consider the property in context and consider the prior history of the use of the property and how it may be used in the future. *Id.*, ¶¶20, 22, 42, 97. Otherwise, the circuit court's determination would be divorced from the facts of this case, and such a determination would be inconsistent with the requirements of *Waller* and WIS. STAT. § 32.05(3m). From that, we conclude that the circuit court properly considered evidence from both the DOT and Island Camping as to whether Island Camping's remaining property after the taking could continue to be operated post-taking as a commercial campground. It then follows that the circuit court may also determine what a reasonable person would do to operate a commercial campground business at that property both before and after the taking. As a result, the circuit court properly considered whether Moyer made business decisions regarding Island Camping that were reasonable in these circumstances.

¶73 Finally, the DOT argues that two out-of-state authorities support its position. We disagree. In *Nall Motors, Inc. v. Iowa City, Iowa*, 410 F. Supp. 111 (S.D. Iowa 1975), federal law applied to the question of whether there was an uneconomic remnant. *See Nall Motors*, 410 F. Supp. at 114-16. In addition, the circumstances in *Nall Motors* were materially distinguishable from this matter because the purported uneconomic remnant was detached from the real estate that

housed plaintiff's place of business. *Id.* at 114. Further, *State of New Mexico ex rel. New Mexico State Highway Department v. United States*, 665 F.2d 1023 (U.S. Court of Claims 1981), is not germane to this appeal because it is relied on by the DOT for the unremarkable proposition that an owner's opinion is not dispositive in determining whether a parcel of land is considered an uneconomic remnant. *Id.* at 1028-29.[15]

¶74    In sum, we reject the DOT's argument that the circuit court erred in basing its decision in part on the remaining property's use as a commercial campground.

### VII.  Temporary Effects of Construction and Demolition.

¶75    The DOT next argues that temporary effects at the Island Camping property caused by construction of the replacement bridge and demolition of the previous bridge do not come within the meaning of the phrase "partial taking" as that phrase is used in WIS. STAT. § 32.05(3m) and, therefore, cannot properly be considered by a court in determining whether the "property remaining" is an uneconomic remnant. For the following reasons, we agree with the DOT.

¶76    We begin with some basics as foundation for our analysis. Island Camping does not dispute that the phrase "partial taking" concerns only

---

[15] The DOT briefly relies on two out-of-state opinions for its contention that its "nationwide review" shows that the circuit court's decision was "unprecedented." Those opinions are not material to our analysis. In *West Virginia Department of Transportation, Division of Highways v. Dodson Mobile Home Sales & Services, Inc.*, 624 S.E.2d 468 (W. Va. 2005), the issue resolved in that appeal did not directly concern an uneconomic remnant. Rather, the appeal concerned an award of attorney fees. *Id.* at 471. Further, *Mississippi Transportation Commission v. Buchanan*, 99 So. 3d 230 (Miss. Ct. App. 2012), contains no substantive discussion about uneconomic remnants. *Id.*, ¶9.

permanent effects to the "remaining property" rather than temporary effects caused by the construction and demolition. As examples, in briefing in this court, Island Camping has stated that "the circuit court *agreed* with DOT that temporary effects of construction could not be considered," and "[t]he record is also clear that the circuit court admitted the evidence of construction activity for the limited purpose that it might be evidence of permanent damage, not for showing temporary effects." That proposition is confirmed by case law. *See, e.g.*, *DeBruin v. County of Green*, 72 Wis. 2d 464, 467, 469-70, 241 N.W.2d 167 (1976) (holding that a "partial taking" does not include "temporary inconvenience" caused by "public improvements work").

¶77 Next, the parties agree that it is the "partial taking" that must be the cause of the "substantially impaired economic viability" under WIS. STAT. § 32.05(3m). *Waller* confirms the point. Section 32.05(3m) requires the partial taking to be the cause of the substantially impaired economic viability; that is, the partial taking must cause the change in the condition of the property so the property becomes of substantially impaired economic viability. *See Waller*, 350 Wis. 2d 242, ¶¶100, 119.

¶78 As a result of those propositions just mentioned, the terms "partial taking" and "property remaining" in the context of WIS. STAT. § 32.05(3m) require that an uneconomic remnant determination be based only on effects of the partial taking that remain after the partial taking is completed and that such effects will continue to adversely affect the condition of the property and its uneconomic viability in the future.

¶79 Within that framework, Island Camping argues that the TLE and the temporary effects of the construction and demolition are part of the "partial taking." We reject Island Camping's arguments for the following reasons.

¶80 First, Island Camping argues that the circuit court considered the drainage and noise problems to be permanent and, therefore, those "construction impacts were actually part of the taking." For this, Island Camping relies solely on a statement by the circuit court during testimony that a potential consideration in its decision may be whether effects are permanent. But, the circuit court did not make a finding that temporary problems such as construction noise or drainage would be permanent. In its argument, Island Camping does not point us to evidence that the temporary problems caused by construction and demolition will not end with the termination of the project. Indeed, Moyer testified that the "majority" of damage to the business is attributed to the "construction period and inconveniences associated with that," and the campsites affected by the TLE will be usable again after the construction.

¶81 Second, Island Camping argues that a partial taking need not be in fee simple, and the circuit court properly considered in its decision a part of the Island Camping property occupied temporarily by the TLE. However, this wholly conclusory argument by Island Camping does not explain its rationale, and we reject that argument for that reason. *Pettit*, 171 Wis. 2d at 646-47.

¶82 Finally, Island Camping argues that, at trial, the DOT considered the "partial taking" to include the TLE. However, the specific portions of the record relied on by Island Camping show nothing of the sort, and we disagree with that assertion.

¶83     Further, we agree with the DOT that the circuit court's decision was based in part on evidence regarding these temporary construction and demolition problems.  As we have already discussed in the Background section of this opinion, the circuit court made no distinction in its decision concerning the substantially impaired economic viability between those temporary problems and the permanent effects of the partial taking of .64 acres.  Moreover, the court explicitly stated that the campground's losses during construction "must be considered in determining … whether or not there is economic viability … and to determine substantially impaired economic viability."  The court also stated that it is "required to look at what was lost as to economic viability during the taking and during the construction period …."

¶84     The circuit court made the temporary effects, such as drainage and noise, from the construction and demolition manifest in its findings of fact and determination that the remaining Island Camping property is of substantially impaired economic viability.  Accordingly, the circuit court's decision was in error because it based its determination in part on such evidence.

## VIII.  The Error Was Not Harmless.

¶85     Because the circuit court erred in basing its decision in part on those temporary effects, the DOT requests that we remand this matter for a new trial.  In response, Island Camping argues that any error by the circuit court in admitting evidence concerning the temporary problems and inconvenience was harmless.  Island Camping does not explicitly rely on WIS. STAT. § 805.18(2) in briefing in this court.  Nonetheless, that statute provides that a new trial shall not be granted because of an error unless "the error has affected the substantial rights" of a party.  Sec. 805.18(2).  Here, Island Camping contends that the substantial rights of the

DOT were not affected "because there was sufficient evidence in the record to support a finding" that Island Camping's remaining property was an uneconomic remnant even without the evidence considered in error by the circuit court. For the following reasons, we disagree.

¶86 An error affects the "substantial rights" of a party if there is "a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue." *Martindale v. Ripp*, 2001 WI 113, ¶32, 246 Wis. 2d 67, 629 N.W.2d 698. An appellate court's confidence in the outcome is stronger when the evidence complained of "was peripheral or the outcome was strongly supported by evidence untainted by error." *Id.*; *see also* *Nommensen v. American Cont'l Ins. Co.*, 2001 WI 112, ¶49, 246 Wis. 2d 132, 629 N.W.2d 301 (the party alleging error has the burden to show its substantial rights have been violated).

¶87 Regarding temporary problems caused by the construction and demolition, Island Camping gives one sentence in its briefing in this court to support its contention that the error of the circuit court was harmless. The first reason given by Island Camping that the error was harmless is that "Johnson's expert opinion did not factor" the TLE "into his before and after value analysis." As previously noted, Johnson's opinion that the property's highest and best use changed to privately owned recreational land was based on the permanent loss of the boat ramp and the fish cleaning station. But, the circuit court rejected that opinion of Johnson that the remaining Island Camping property's highest and best use is as private recreational property because that opinion "didn't make sense." Also as previously noted, the circuit court, immediately after making that statement in its ruling rejecting that opinion from Johnson, went on to state that there is "some economic viability" in the property as a campground even though it "certainly isn't worth what it was at the time of the taking." Accordingly,

Johnson's opinion does not "strongly support" the proposition that the circuit court's decision was untainted by error. *Martindale*, 246 Wis. 2d 67, ¶32.

¶88    The other reason given by Island Camping in its one sentence in support of its argument is that the Island Camping property "permanently lost its improvements." Island Camping does not explain what those "improvements" are, and we could reject that argument solely because it is unsupported. *Pettit*, 171 Wis. 2d at 646-47. Nonetheless, we will consider the purported permanently lost improvements referred to in that sentence as the permanent loss of the boat ramp, fish cleaning station, thirteen campsites, and seven slips at the marina. However, Island Camping gives no citation to the circuit court's decision to support its assertion that the court came to the conclusion that the remaining Island Camping property was an uneconomic remnant solely because of the permanent loss of those improvements. With that deficit in Island Camping's assertion, Island Camping's argument necessarily fails.

¶89    Moreover, it can be determined that an error did not affect the substantial rights of a party if the error concerned evidence that was "peripheral." *Martindale*, 246 Wis. 2d 67, ¶32. As discussed above, the circuit court's consideration of the temporary effects of the construction and demolition was intertwined with its conclusion that the remaining Island Camping property is an uneconomic remnant. Accordingly, it cannot be stated that such evidence was peripheral to the circuit court's decision.

¶90    In sum, we conclude that the error of the circuit court was not harmless, and a new trial is necessary.

## CONCLUSION

¶91    For the foregoing reasons, the judgment of the circuit court is reversed, and this matter is remanded for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded with directions.

Not recommended for publication in the official reports.